## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BETTY EAKIN, *et al.*,

     Plaintiffs,

v.

                                      Case No. l:22-cv-340-SPB

ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,

     Defendants.

## AMICUS CURIAE BRIEF OF RESTORING INTEGRITY AND TRUST IN ELECTIONS, INC. IN SUPPORT OF SUMMARY JUDGMENT AGAINST PLAINTIFFS

## IDENTITY AND INTEREST OF AMICUS CURIAE

Restoring Integrity and Trust in Elections, Inc. (RITE) submits this brief as Amicus Curiae in support of summary judgment against Plaintiffs. RITE is a 501(c)(4) non-profit organization with the mission of protecting the rule of law in the qualifications for, process and administration of, and tabulation of voting throughout the United States. RITE also supports laws and policies that promote secure elections and enhance voter confidence in the electoral process. Its expertise and national perspective on voting rights, election law, and election administration will assist the Court in reaching a decision consistent with the rule of law.

## INTRODUCTION

This case involves a challenge to Pennsylvania's ballot-dating requirement. This reasonable regulation helps ensure that mail-in votes are valid, timely submissions from qualified voters. For example, in one recent case where a fraudulent ballot was submitted in a deceased person's name, the date of the declaration—twelve days after the alleged voter passed away—was the only evidence on the face of the envelope that the vote was not valid. *See* Doc. 241 at 6. Although the date requirement protects the integrity of Pennsylvania's elections, Plaintiffs attack it as somehow a violation of voters' federal civil rights.

Election rules that protect the integrity of the ballot, like Pennsylvania's date requirement, are ubiquitous throughout the country. *See Republican Party of Penn. v. Degraffenreid*, 141 S. Ct. 732, 736 (2021) (Thomas, J., dissental). They are particularly important for mail-in voting, which takes place outside the presence of election officials and presents a heightened risk of fraud and other irregularities.

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2348 (2021). Pennsylvania has "weighty reasons" for rules such as the date requirement, *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 34 (2020) (Kavanaugh, J., concurral), as explained in a recent decision by the Pennsylvania Supreme Court, *see Ball v. Chapman*, 289 A.3d 1, 20-23 (Pa. 2023). Those reasons "warrant judicial respect." *Democratic Nat'l Comm.*, 141 S. Ct. at 34.

Plaintiffs argue that Congress, with a single line in the Civil Rights Act, prohibited Pennsylvania from enacting basic rules of election administration. Not so. The sentence upon which Plaintiffs base their claim, the so-called materiality provision, prevents States from "deny[ing]" someone the right to vote because of an error or omission on "any record or paper relating to any application, registration, or other act requisite to voting," unless the error or omission is "material" to whether the voter is "qualified under State law." 52 U.S.C. §10101(a)(2)(B). This "provision was intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). That practice was common in the Jim Crow South, where registrars would deny black voters' registration due to "minor misspelling errors or mistakes in age or length of residence," while forgiving those errors in white voters' registration. H.R. Rep. No. 88-914 (Nov. 20, 1963), 1964 U.S.C.C.A.N. 2391, 2491.

Consistent with this history, the materiality provision (if the Court concludes that it reaches vote denials other than those based on race, notwithstanding the 15th Amendment) applies only to errors or omissions on papers used to determine whether a voter is qualified as an elector. It does not reach mine-run rules governing the voting process itself. Its text addresses errors and omissions in a "record or paper relating to any application, registration, or other act requisite to voting" that are "not material in determining whether [an] individual is qualified under state law to vote." 52 U.S.C. §10101(a)(2)(B). The "acts *requisite* to voting" covered by this text are those "material to the question whether a person is qualified to vote." *Ritter v. Migliori*, 142 S. Ct. 1824, 1826 (June 9, 2022) (Mem.) (Alito, J., dissental).

Plaintiffs contort the materiality provision into a federal prohibition on any election regulation that does not prove a voter's qualifications. They insist that Pennsylvania's date requirement should be invalidated because, in their view, it is not relevant to whether a voter is qualified. But this expansive theory would hyper-federalize election administration and cannot be squared with the text of the law.

The provision's text and history confirm that it covers only records used to determine whether a voter is qualified. And no extant case law supports Plaintiffs' extravagant reading. Plaintiffs ask the Court to revive the Third Circuit's vacated decision in *Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022). *See* Doc. 228 at 11-13; s*ee generally* Docs. 220, 266. But that vacated panel opinion does not bind this (or any) Court. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39-41 (1950). And its

arguments are not even persuasive for several reasons, including "the lack of genuine disagreement [between the parties] on key questions" in that case. *Migliori*, 36 F.4th at 164 (Matey, J., concurring in the judgment). The panel did not address, for example, the key reason Plaintiffs' theory is wrong: the materiality provision applies only to voter-qualification rules, not regulations of the time, place, and manner of voting such as the date requirement. In fact, the panel (wrongly) assumed the materiality provision constrains ordinary state rules about how to cast a ballot and spent "little effort to explain how its interpretation can be reconciled with the language of the statute." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). Three Justices concluded the Third Circuit's "interpretation is very likely wrong." *Id.* at 1824.

Plaintiffs also rely upon the non-controlling opinion of three justices of the Pennsylvania Supreme Court. *See Ball v. Chapman*, 289 A.3d 1 (Pa. 2023). But that effort also fails. In addition to failing to garner the support of a majority of the court, those justices never considered whether the acts requisite to voting covered by the provision are those involved in qualification determinations, not rules about the voting process itself.

Plaintiffs' theory is also wrong because it would prohibit States from enacting nearly *any* rule to protect their legitimate interest in administering elections. After all, "[c]asting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Brnovich*, 141 S. Ct. at 2338. Those rules serve a variety of "strong and entirely legitimate state interest[s]." *Id.* at 2340. They ensure "orderly, efficient election[s]." *Democratic Nat'l*

*Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurral). They aid in "the prevention of fraud" and the preservation of "confidence in the fairness" of elections. *Brnovich*, 141 S. Ct. at 2338. They "[e]nsur[e] that every vote is cast freely, without intimidation or undue influence." *Id.* They "preserv[e] the integrity of [the State's] election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). And they provide reasonable assurance of "voter qualifications." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 (2008). Plaintiffs argue, however, that election rules that require written entries on documents or records are valid only if they serve the purpose of ensuring that a voter is qualified. Under this theory, a State would not be able enforce a variety of commonplace rules, including those regarding witness certifications and proper addressing of mail-in ballots to ensure their timely submission.

The date requirement is required by state law, serves legitimate state interests, and does not violate federal law. This Court should grant summary judgment against Plaintiffs on their materiality provision claim.

## ARGUMENT

Pennsylvania's ordinary voting rules do not violate the materiality provision because that provision reaches only errors or omissions on documents or records used to establish voter qualifications under state law. This conclusion follows from the text of the provision:

> No person acting under color of law shall … deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election….

6

52 U.S.C. §10101(a)(2)(B). The provision applies to determinations regarding whether a voter is "qualified." *Id.* It does not apply wholesale to all rules regarding any election-related record or paper. Further, the provision applies to executive action that "den[ies] the right of any individual to vote." *Id.* It does not apply to a voter's failure to properly cast a ballot. And the provision applies to requirements that are not material "under State law." *Id.* It takes state law regarding qualifications as given and does not apply to requirements that state law says are mandatory.

Much of the recent confusion about the materiality provision stems from overlooking that it governs determinations of voter *qualification*. It does not extend to rules governing the mechanics of voting, the casting and counting of ballots, or election rules generally. Courts understood that principle for decades, applying the materiality provision with little trouble to state action that unfairly and illegally misclassified qualified voters as unqualified voters. Until the Third Circuit's now-vacated decision in *Migliori*, no court had adopted Plaintiffs' broad, textually unsupportable reading of the materiality provision to reach rules for casting a valid ballot.

It is clear why: Plaintiffs' reading creates an interpretive nightmare. It would require courts to answer absurd questions such as, "Does a date requirement relate to a voter's qualifications, and if so, is that relationship material?" Or "How does a signature requirement relate to a voter's qualifications?" Or "How does a witness requirement or use of a secrecy envelope relate to a voter's qualifications?" Congress did not ask courts to evaluate any of these questions. This Court should avoid them,

as others have for decades, by simply observing that the materiality provision regulates how States go about establishing whether a particular individual is qualified to vote. It prohibits state action that *disqualifies* voters who would otherwise be *qualified* voters under state law. The date requirement here does not do that. It does not disqualify anyone from being a lawful voter. But it does help election officials ensure the validity of submitted mail ballots.[1]

### I.   The materiality provision governs the determination of voter qualifications; it does not regulate ballot validity.

The materiality provision does not speak to what a qualified voter must do to cast a valid ballot. Instead, it bars election officials from determining that a person is not "qualified … to vote" based on an error or omission unrelated to the State's voting qualifications on forms that a State has established as prerequisites to securing the ability to vote. 52 U.S.C. §10101(a)(2)(B). By its terms (and to the extent it is not focused on racial discrimination) this provision applies to "the requirements that must be met in order to register (and thus be 'qualified') to vote," not "the requirements that must be met in order to cast a ballot that will be counted." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). For example, it would bar an election official from disqualifying a male citizen who failed to indicate he had registered with the Selective Service Administration when state law does not require that registration.

---

[1] Plaintiffs' claims also fail because they plaintiffs no private right of action to sue under the materiality provision. Section 10101 provides that "the Attorney General" may sue under the statute. 52 U.S.C. §10101(C). As the Sixth Circuit has recognized, the implication of that grant of specific enforcement authority is that individuals may not bring a civil action to enforce the materiality provision. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (2016).

Likewise, it would bar an election official from disqualifying a citizen who failed to check a box indicating marital status when state law does not require that information. Several textual features confirm this reading.

*First,* the materiality provision applies only to an "error or omission" in an "application, registration, or other act requisite to voting" that is not relevant to "determining whether such individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). In other words, "it is not enough that the error or omission be immaterial *to* whether the individual is qualified to vote; the paper or record must also be used 'in determining' the voter's qualifications." *Ball*, 289 A.3d at 38 (opinion of Brobson, J.). The paper or record at issue must be part of a State's process to determine whether the individual meets the requirements under state law to be classified as an elector. If the "paper or record" at issue does not do that—like, for example, a ballot—the materiality provision doesn't apply.

In short, the materiality provision is not a remedy for voters who are qualified to vote but fail to vote properly. Rather, as courts have consistently held, it "prohibits states from *disqualifying* potential voters based on their failure to provide information not relevant to determining their eligibility to vote." *Schwier*, 340 F.3d at 1286-87 (emphasis added). The materiality provision does not apply to qualified voters who fail to follow otherwise valid state-law procedures for casting a ballot. Those voters have not been denied the right to vote. They have not been barred from the polling place or refused a ballot. Rather, like any other person who has not followed the rules for voting, they have simply not voted.

*Second*, the materiality provision is nested in a subsection addressing voter qualifications. The subsection begins, "All citizens of the United States who are *otherwise qualified by law* to vote at any election … shall be entitled and allowed to vote at all such elections…." 52 U.S.C. §10101(a)(1) (emphasis added). The materiality provision is also sandwiched between two paragraphs placing limits on the determination of voter qualifications: Paragraph (a)(2)(A) prevents state actors from discriminatory application of rules "in determining whether any individual is qualified under state law or laws to vote in any election." *Id.* §10101(a)(2)(A). And paragraph (a)(2)(C) restricts state actors from "employ[ing] any literacy test as a qualification for voting in any election." *Id.* §10101(a)(2)(C). "[W]ords must be read and interpreted in their context, not in isolation." *Sw. Airlines Co. v.* Saxon, 142 S. Ct. 1783, 1788 (2022) (cleaned up). The materiality provision's placement in the middle of these limitations on voter-qualification determinations confirms that it too applies only to voter-qualification requirements. 52 U.S.C. §10101(a)(2)(B).

*Third*, reading the materiality provision to reach beyond eligibility determinations would cause shocking results that would upend election administration nationwide. Mine-run voting rules such as signature requirements and ballot deadlines do not neatly align with a voter's qualifications to vote. They serve different, entirely legitimate purposes, "and it would be absurd to judge the validity of [those] voting rules based on whether they are material to eligibility." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). Signature requirements, secrecy envelopes, voter assistance declarations, over- or under-marked ballots—none of

10

those rules relate to a voter's qualifications. 25 Pa. Stat. §§3063(a), 3050, 3146.6(a), 3150.16(a). But a reading that extends the materiality provision to the mechanics of casting a vote would invalidate those rules.

Case law does not defeat this common-sense reading. Prior to the *Migliori* panel's decision, "[n]othing in … the case law … indicate[d] that section 1971(a)(2)(B) was intended to apply to the counting of ballots by individuals already deemed qualified to vote." *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1371 (S.D. Fla. 2004). For its part, the *Migliori* panel did not discuss these textual and structural features. Instead, it assumed the materiality provision applied to all election rules and began its analysis by asking whether the date requirement "is material in determining whether such individual is qualified to vote under Pennsylvania law." *Migliori*, 36 F.4th at 162. But that's the wrong starting point. The "first question is whether [Pennsylvania's date requirements] are provisions used 'in determining whether [an] individual is qualified under State law to vote.'" *Ball*, 289 A.3d at 38 (opinion of Brobson, J.) (second alteration in original) (quoting 52 U.S.C. §10101(a)(2)(B)). If the requirements themselves do not affect determinations regarding a voter's qualifications, "then they do not fall within the scope of state laws that are subject to the material error provision." *Id.*

This Court must answer that first question: does the requirement that voters "fill out, date and sign the declaration" provided on the envelope in which they place their ballot have any relevance to the state law determination of whether an individual is qualified to vote? 25 Pa. Stat. §§3146.6(a), 3150.16(a). Plaintiffs admit

that it does not, conceding that the date requirement "has no relevance to determining whether an individual is qualified to vote under Pennsylvania law." Doc. 228 at 4. That ends the inquiry. Since the date requirement has nothing to do with determining voter qualification, it is outside the domain of the materiality provision. *See Vote.Org v. Callanen*, 39 F.4th 297, 306 n.6 (5th Cir. 2022).

Nor does the plurality opinion of the Pennsylvania Supreme Court in *Ball* support a different conclusion. The plurality believed that the materiality provision applies since the date requirement is an "application, registration, or *other act* requisite to voting." *Ball*, 289 A.3d at 26 (plurality op.) (emphasis added). Of course, the date requirement is not an "application" or a "registration." So the plurality concluded that the requirement was an "other act requisite to voting." But it never defined what an "other act requisite to voting" means, or considered whether it is limited to things *like* "applications" or "registrations" that are used to determine whether an individual is qualified to vote under state law. 52 U.S.C. §10101(a)(2)(B). It instead simply concluded that the phrase must encompass "something else" beyond an application or registration, and that the date requirement fell into that undefined bucket because dating the ballot is a step in the process of having that ballot counted. *Ball*, 289 A.3d at 26-27.

The *Ball* plurality's analysis fails to read the statute in context, in accordance with the rules of statutory interpretation. The phrase "other act requisite to voting" is a catch-all term at the end of a list. And such general catch-all phrases "should not be construed in their widest context." *Dep't of Env't Prot. v. Cumberland Coal Res.*,

102 A.3d 962, 976 (Pa. 2014) (applying the ejusdem generis canon). Rather, courts must "interpret a general or collective term at the end of a list of specific items in light of any common attributes shared by the specific items." *Sw. Airlines*, 142 S. Ct. at 1789 (cleaned up). "As applied here, the statutory catch-all phrase 'other act requisite to voting' is limited by the prior list of 'acts,' which consist of applying or registering to vote"—that is, acts that determine a voter's qualifications. *Ball*, 289 A.3d at 38 n.11 (opinion of Brobson, J.).

The plurality's only support for its expansive interpretation fails. The plurality was concerned that any step in casting a ballot could be "conceive[d] of … as voting" rather than a requisite step to voting. *Id.* at 26 (plurality op.) In its view, "[i]f *all* of the steps involved in casting a ballot are encompassed in voting, then 'other act requisite to voting' bears no meaning." *Id.* at 27. It then sought to solve this alleged superfluity problem by means of a circular distinction. According to the plurality, filling out a ballot and transporting it are "voting" because they are necessary steps to having the ballot counted, but dating the ballot is an "other act requisite to voting," despite also being a state law requirement to having the ballot counted. *Id.*

The plurality's strained reading, however, was not necessary to avoid any superfluity and give independent meaning to "other acts requisite to voting." A simpler, less circular dividing line is evident in the text. The materiality provision reaches all records or papers used to make determinations of voter qualification. In this context, an "other act requisite to voting" refers to any act other than application or registration that goes to a voter's qualifications. For example, routine proof of

residence forms mailed out to voters and certain notices under the National Voter Registration Act might not be "application[s]" or "registration," but they nonetheless might be used to determine a voter's qualifications.

And it is little wonder that the Congress fighting Jim Crow laws would have included this catch-all provision. It knew that registrations and applications were not the only papers relentlessly creative States might use to trip up individuals registering to vote. It is easy enough to conceive of other paper-based tests States might deploy to prevent such qualification. Errors on documentation for public assistance programs, for example. But there is no indication that Congress intended the materiality provision to regulate run-of-the-mill, easy to understand ballot-integrity provisions like signature and date requirements. Other courts have rejected the "broader interpretation" that the plurality adopted because it disregards "the more narrow protection" of the materiality provision—and the more textually supported reading—which reaches only voter qualifications. *Friedman*, 345 F. Supp. 2d at 1372.

Both the *Migliori* panel and the *Ball* plurality overlooked that the statute's domain is determinations of voter qualification. That textual observation avoids the circular reasoning that pervades those opinions. "Congress may well have been concerned about denials of the right to vote at all stages and components of the voting process—from application to registration to casting to counting—but [the materiality provision] provides specifically for protections against denials based on errors or

omissions on 'records or papers' that are immaterial to the determination of an individual's qualification to vote." *Id.*

## II.   The materiality provision does not apply because the date requirement doesn't deny anyone the right to vote.

The materiality provision does not apply to the date requirement because it doesn't "deny the right of any individual to vote." 52 U.S.C. §10101(a)(2)(B). Again, "casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Brnovich*, 141 S. Ct. at 2338. Rejecting a ballot when a voter fails to comply with these rules is "not the denial" of the right to vote. *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). Instead, "the failure to follow those rules constitutes the forfeiture of the right to vote." *Id.*; *see also Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973) (A statute that "merely imposed a time deadline" on newly registered voters to enroll in a political party did not "disenfranchise" those voters because "it is clear that they could have [enrolled], but chose not to.").

For this reason, a person is denied the right to vote under the materiality provision if that person is erroneously deemed not "qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). But "[w]hen a mail-in ballot is not counted because it was not filled out correctly, the voter is not denied 'the right to vote.' Rather, that individual's vote is not counted because he or she did not follow the rules for casting a ballot." *Ritter*, 142 S. Ct. at 1825. For the same reason, "reasonable election deadlines do not 'disenfranchise' anyone under any legitimate understanding of that term." *Democratic Nat'l Comm.*, 141 S. Ct. at 35 (Kavanaugh, J., concurral). Because

a voter who fails to date her ballot remains "qualified under State law to vote," the exclusion of her ballot is not a "denial" of her right to vote within the meaning of the provision. Her right is fully intact, but like every other voter, she must follow the rules to ensure her ballot is counted.

The alternative reading is untenable. Plaintiffs' theory would mean that anytime a voter's vote is rejected because she failed to follow the rules for voting, she is "den[ied] the right … to vote." 52 U.S.C. §10101(a)(2)(B). But "[i]t cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under [the materiality provision]." *Vote.Org*, 39 F.4th at 306 n.6. That would mean that "virtually every rule governing how citizens vote would [be] suspect." *Id.*

The *Migliori* panel also did not address this part of the text. And the *Ball* plurality's analysis again falls short. The plurality contended the argument "would be persuasive" but for the statute's "expansive definition for the word 'vote.'" *Ball*, 289 A.3d at 24 (plurality op.). But that misunderstands the argument, which has nothing to do with how broadly one construes the word "vote." The failure to follow commonplace election rules constitutes the "forfeiture of the right to vote, not the denial of that right," no matter how broadly a "vote" is defined. *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental).

The plurality insisted that the denial–forfeiture distinction was unhelpful because "every 'error or omission' would constitute an elector's accidental forfeiture of his or her vote by failing to follow the rules for voting," and that "[t]he text draws

no [such] distinction." *Ball*, 289 A.3d at 25 (plurality op.). But that argument ignores that there must be some distinction between denial and forfeiture for a State to enforce rules governing voting—which even the plurality acknowledged that it must be able to do. The plurality could not draw that distinction because it conflated the qualifications of a voter with the act of voting. Those are distinct concepts. Some errors—such as submitting a ballot that has not been filled out—are forfeitures of the right to vote. That is, they are failures to exercise the right properly. Other errors— such as misstating "the exact number of months and days in [one's] age"—are not material to a voter's qualifications. *Schwier*, 340 F.3d at 1294. An election official "den[ies] the right … to vote" to someone under the materiality provision only when he disqualifies a voter for errors in the latter category. 52 U.S.C. §10101(a)(2)(B).

### III. The materiality provision does not apply to legislative enactments establishing voting procedures.

The materiality provision doesn't preempt Pennsylvania's date requirement for a third reason: the provision applies to ad hoc executive actions, not state laws that are duly enacted by the Legislature. The statute forbids action taken based on an error or omission that is "not material in determining whether [an] individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). In other words, the statute asks whether the error or omission was material "under State law." *Id.* The plain text does not cover errors or omissions that state law says are material. Nor could it, as States have plenary authority over voter qualifications, subject to constitutional limitations. Hence, plaintiffs proceeding under the materiality provision must allege that the defendant went beyond state law and disqualified a

voter based on something state law had not established as a qualification. *See, e.g.*, *Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005) (ruling that requiring social security numbers from prospective voters "is not material in determining whether one is qualified to vote under Georgia law" because Georgia law did not require social security numbers); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018) (ruling that an election practice violated the materiality provision where it was not required by "Georgia law").

But Plaintiffs' problem is with state law itself. Pennsylvania law requires voters to "fill out, *date* and sign" the declarations on their mail-in ballots. 25 Pa. Stat. §3150.16(a) (emphasis added); *accord id.* §3146.6(a). That "unambiguous and mandatory" requirement means that "that ballots must be dated" with "the date of signing of the declaration," and that "failure to provide a date [will] result in disqualification." *Ball*, 289 A.3d at 21-23 (Maj. op.). That conclusion ends the inquiry under the materiality provision. *See Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (ruling that election officials "may reject applications and ballots that do not clearly indicate the required information required by Missouri statute without offending 52 U.S.C. §10101(a)(2)(B)").

The *Migliori* panel erred by judging the materiality of the date requirement against executive practice. The panel reasoned that the date requirement couldn't be material to a voter's qualifications because "the [Lehigh County Board of Elections] counted ballots with obviously incorrect dates." *Migliori*, 36 F.4th at 163. But a county's practice—especially an *erroneous* practice—is not the measure of what is

18

material. "State law" is. And if there were any doubt about the meaning of state law,[2] "an undeniable majority" of the Pennsylvania Supreme Court "has determined that the [date requirement] is unambiguous and mandatory." *Ball*, 289 A.3d at 21. The date requirement is, in other words, "material … under State law." 52 U.S.C. §10101(a)(2)(B). Like the *Migliori* panel, the *Ball* plurality assumed that executive practice, not state law, was the relevant metric for materiality. Neither court justified that assumption.

Even if executive practice were relevant, that practice has changed since *Migliori*. Counties no longer count ballot with "obviously incorrect dates." *Migliori*, 36 F.4th at 163. All counties must reject undated or incorrectly dated ballots. *Ball*, 289 A.3d at 21-23. By the *Migliori* panel's own measure, the date requirement is material.

\*     \*     \*

Interpreting the statute to prohibit state voting procedures would not only contravene its text and history but also give a "de facto green light to federal courts to rewrite dozens of state election laws around the country," wherever any State imposes any paper-based requirements on voters beyond what a court deems to be the State's material voter qualifications. *Democratic Nat'l Comm.*, 141 S. Ct. at 35 (Kavanaugh, J., concurral). "[A]s a practical matter, there must be a substantial

---

[2] *But see In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1090 (Pa. 2020) (Dougherty, J., concurring) ("[T]he meaning of the terms 'date' and 'sign'—which were included by the legislature—are self-evident, they are not subject to interpretation, and the statutory language expressly requires that the elector provide them.").

regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citation omitted). But under Plaintiffs' interpretation, "virtually every rule governing how citizens vote would [be] suspect." *Vote.Org*, 39 F.4th at 306 n.6.

Congress did not write a law requiring every voting procedure in this country to be tied to a voter's qualifications. No precedential authority supports Plaintiffs' theory. The Third Circuit's vacated decision in *Migliori* did not address the key arguments at play in this case. And the *Ball* plurality acknowledged the need for some distinction between rules governing voting and the covered "acts requisite to voting." But it set an arbitrary line without even considering the statutory distinction between qualifications and voting process. The Court should reject Plaintiffs' novel arguments.

## CONCLUSION

For these reasons, the Court should grant summary judgment against Plaintiffs.

Dated: April 24, 2023

Respectfully submitted,

*/s/ Cameron T. Norris*

Cameron T. Norris*
    Bar No. TN 33467
Gilbert C. Dickey*
    Bar No. NC 58350
Conor D. Woodfin*‡
    Bar No. DC 1780807
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

**pro hac vice* forthcoming

‡ Admitted in the District of Columbia.
Virginia bar application is pending.
Supervised by principals of the firm.

*Counsel for Amicus Restoring Integrity and Trust in Elections, Inc.*