**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION**

| | |
|---|---|
| BETTE EAKIN, *et al.*,<br><br>    Plaintiffs,<br><br> v.<br><br>ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,<br><br>   Defendants. | Case No. 1:22-cv-00340-SPB |

**PLAINTIFFS' CONSOLIDATED BRIEF IN OPPOSITION TO DEFENDANTS' AND
INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

    I.    Plaintiffs have Article III standing for their claims against Lancaster County and Berks County Boards of Elections. ................................................................ 2

        A.    DSCC, DCCC, and the Federation have associational standing to bring claims on behalf of their members and constituents. ............................................... 3

        B.    The Organizational Plaintiffs have direct standing to sue over their own injuries caused by Lancaster and Berks Counties. ........................................... 5

    II.    Plaintiffs have a private right to enforce the Materiality Provision of the Civil Rights Act. .................................................................................................... 6

    III.    The Date Provision violates the Materiality Provision. ................................ 10

        A.    County Boards' enforcement of the Date Provision results in a denial of the right to vote. ................................................................................................ 12

        B.    The Date Provision relates to an application, registration, or other act requisite to voting. ........................................................................................... 13

        C.    The handwritten date on a mail ballot's outer envelope is unrelated to the voter's qualifications. ................................................................................ 16

    IV.    The Date Provision violates the First and Fourteenth Amendments under the *Anderson-Burdick* test. .......................................................................................... 17

        A.    Rejecting mail ballots implicates the fundamental right to vote. ........................... 17

        B.    Defendants' enforcement of the Date Provision imposes a serious burden on Pennsylvanians' right to vote. ...................................................................... 19

        C.    The Date Provision does not serve any state interest. ........................................... 20

        D.    Plaintiffs' expert testimony shows that the Date Provision disproportionately burdens racial minorities and older voters. ........................................................ 23

CONCLUSION ................................................................................................................. 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alexander v. Riga,*
   208 F.3d 419 (3d Cir. 2000)....................................................................................5

*Ali v. Fed. Bureau of Prisons,*
   552 U.S. 214 (2008).............................................................................................15

*Am. Party of Tex. v. White,*
   415 U.S. 767 (1974).............................................................................................18

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983).......................................................................................17, 18

*Belitskus v. Pizzingrilli,*
   343 F.3d 632 (3d Cir. 2003).................................................................................22

*Burdick v. Takushi,*
   504 U.S. 428 (1992).............................................................................................17

*Chapman v. Berks Cnty. Bd. of Elections,*
   No. 355 M.D. 2022, 2022 WL 4100998 (Pa. Cmwlth. Aug. 19, 2022)..................20

*Citizens Coal Council v. Matt Canestrale Contracting, Inc.,*
   40 F. Supp. 3d 632 (W.D. Pa. 2014).......................................................................3

*City of Rancho Palos Verdes v. Abrams,*
   544 U.S. 113 (2005)...........................................................................................8, 9

*Cottrell v. Alcon Labs.,*
   874 F.3d 154 (3d Cir. 2017)....................................................................................3

*Council of Alt. Pol. Parties v. Hooks,*
   121 F.3d 876 (3d Cir. 1997)..................................................................................19

*Crawford v. Marion Cnty. Election Bd.,*
   553 U.S. 181 (2008)...................................................................................18, 20, 24

*Democratic Exec. Comm. of Fla. v. Lee,*
   915 F.3d 1312 (11th Cir. 2019) ........................................................................17, 19

*Fair Hous. Rts. Ctr. in Se. Pa. v. Post Goldtex GP, LLC,*
   823 F.3d 209 (3d Cir. 2016)....................................................................................5

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) ....................................................................22

*Fitzgerald v. Barnstable Sch. Comm.*,
    555 U.S. 246 (2009)........................................................................................9

*Ford v. Tenn. S.*,
    No. 06-2031-DV, 2006 WL 8435145 (W.D. Tenn. Feb. 1, 2006) ...........................13

*Freeman v. Corzine*,
    629 F.3d 146 (3d Cir. 2010)........................................................................5, 6

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002)....................................................................................7, 8

*Goosby v. Osser*,
    409 U.S. 512 (1973) ......................................................................................18

*Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*,
    570 F.3d 520 (3d Cir. 2009).........................................................................7, 8

*Green Party of N.Y. v. N.Y. State Bd. of Elections*,
    389 F.3d 411 (2d Cir. 2004)..........................................................................22

*Idahoan Fresh v. Advantage Produce, Inc.*,
    157 F.3d 197 (3d Cir. 1998)..........................................................................15

*June Med. Servs. L. L. C. v. Russo*,
    140 S. Ct. 2103 (2020)....................................................................................5

*La Union del Pueblo Entero v. Abbott*,
    No. 5:21-CV-0844-XR, 2022 WL 3045657 (W.D. Tex. Aug. 2, 2022)......................6

*League of Women Voters of Ark. v. Thurston*,
    No. 5:20-CV-05174, 2021 WL 5312640 (W.D. Ark. Nov. 15, 2021)
    ..........................................................................................6, 11, 12, 14

*Martin v. Crittenden*,
    347 F. Supp. 3d 1302 (N.D. Ga. 2018) ...........................................................13

*Mazo v. N.J. Sec'y of State*,
    54 F.4th 124 (3d Cir. 2022) .....................................................................18, 24

*McDonald v. Board of Election Commissioners of Chicago*,
    394 U.S. 802 (1969)...............................................................................17, 18

*McKay v. Thompson*,
    226 F.3d 752 (6th Cir. 2000) ........................................................................10

*Migliori v. Cohen,*
    36 F.4th 153 (3d Cir. 2022) .................................................................... *passim*

*Northeast Ohio Coalition for the Homeless v. Husted,*
    837 F.3d 612 (6th Cir. 2016) ...................................................................10, 19, 20

*O'Brien v. Skinner,*
    414 U.S. 524 (1974) .................................................................................18

*Ohio State Conf. of N.A.A.C.P. v. Husted,*
    768 F.3d 524 (6th Cir. 2014) ...................................................................22

*Pa. Psych. Soc'y v. Green Spring Health Servs., Inc.,*
    280 F.3d 278 (3d Cir. 2002)....................................................................4

*Peyton v. Rowe,*
    391 U.S. 54 (1968)..................................................................................11

*Puerto Rico v. Franklin Cal. Tax-Free Trust,*
    579 U.S. 115 (2016)................................................................................15

*Real Alts., Inc. v. Sec'y Dep't of Health & Hum. Servs.,*
    867 F.3d 338 (3d Cir. 2017)....................................................................1, 14

*Schwier v. Cox,*
    340 F.3d 1284 (11th Cir. 2003) ............................................................ *passim*

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp,*
    No. 1:21-CV-01284-JPB, 2021 WL 6495360 (N.D. Ga. Dec. 9, 2021)................................12

*Tex. Democratic Party v. Hughs,*
    474 F. Supp. 3d 849 (W.D. Tex. 2020)..................................................7

*Tineo v. Attorney General of the United States,*
    937 F.3d 200 (3d Cir. 2019)....................................................................4

*United States v. Classic,*
    313 U.S. 299 (1941)................................................................................12

*Wilder v. Va. Hosp. Ass'n,*
    496 U.S. 498 (1990)................................................................................8

**Statutes**

25 P.S. § 2811 ...............................................................................................16

25 P.S. § 3063(a)...........................................................................................16

25 P.S. § 3150.16(a).......................................................................................15

25 Pa. C.S.A. § 1301(a) .................................................................................................16

25 Pa. C.S.A. § 1505(a) .................................................................................................20

42 U.S.C. § 1983 .......................................................................................................... *passim*

52 U.S.C. § 10101(a)(2)(B) ......................................................................................... *passim*

52 U.S.C. § 10101(a)(3)(A) ...........................................................................................16

52 U.S.C. § 10101(d) ......................................................................................................9

52 U.S.C. § 10101(e) ..........................................................................................2, 12, 16

Civil Rights Act, Title VI, 42 U.S.C. § 2000d .................................................................7

Education Amendments of 1972, Title IX, 20 U.S.C. § 1681 .........................................7

**Other Authorities**

H.R. Rep. No. 85-291 (1957).............................................................................................9

## INTRODUCTION

The motions for summary judgment filed by Defendants Lancaster County Board of Election and Berks County Board of Elections ("County Boards"), ECF No. 280, and Intervenors the Republican National Committee, National Republican Congressional Committee, and the Republican Party of Pennsylvania ("Intervenors"), ECF No. 282, confirm that the material facts in this case are not genuinely disputed. Pennsylvania law requires county boards of elections to reject an otherwise valid mail-in or absentee ballot if, in timely submitting that ballot, the voter mistakenly failed to write a date that the boards deem correct on the ballot return envelope (hereinafter, "Date Provision"), *see* ECF No. 282 at 1, but that handwritten date is irrelevant in determining whether an individual is qualified to vote, *id.* at 13.

Section 101 of the Civil Rights Act prohibits states from refusing to count a person's ballot on the ground that the person made a mistake on a piece of paper that is immaterial to their qualification to vote. *See* 52 U.S.C. § 10101(a)(2)(B) (the "Materiality Provision"). That is exactly what happens when the County Boards enforce the Materiality Provision—as the Third Circuit recently held in an opinion that, while mooted, clearly reflects that court's views. *Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir. 2022), *judgment vacated as moot sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (Mem.) (2022); *see also Real Alts., Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 356 (3d Cir. 2017) (opinion vacated on non-merits grounds "sets forth the view of our Court"). Plaintiffs are entitled to judgment as a matter of law on all counts and the Court should deny summary judgment to the County Boards and Intervenors.

Nothing in the County Boards' or Intervenors' motions for summary judgment alters this conclusion. Lancaster and Berks Counties' attempt to attack Plaintiffs' standing and their right to bring this action fails because the Date Provision has resulted in thousands of ballots being discarded—including those of Plaintiffs' members and constituents who live and vote across

1

Pennsylvania, Pls.' Concise Statement of Material Facts, ECF No. 289, ("CSMF") ¶¶ 104–05, 113–15, 121; Pls.' Statement of Additional Material Facts ("SAMF") ¶¶ 1–3—and will continue to result in otherwise-valid ballots being discarded in future elections. Furthermore, enforcement of the Date Provision requires Plaintiffs to divert resources away from their other activities and towards understanding how each county intends to apply the Date Provision and assisting their members to avoid disenfranchisement. CSMF ¶¶ 99–103, 110–12, 122–23. And well-established case law makes clear that private plaintiffs can sue to enjoin violations of the Materiality Provision. *See, e.g.*, *Schwier v. Cox*, 340 F.3d 1284, 1294-1296 (11th Cir. 2003).

Intervenors take another approach: they attempt to narrow the Materiality Provision to the point of obsolescence by reading into the statute various restrictions that would limit the Provision's protections to registration materials, and only to information used to determine voter eligibility. The plain text of the Materiality Provision defies these efforts. The law provides broad protection to ensure that qualified voters are not disenfranchised through strict application of needless technicalities such as the Date Provision on papers or records used at any stage of the voting process—from registration to vote counting. *See* 52 U.S.C. § 10101(e) (defining "vote").

Plaintiffs are entitled to judgment as a matter of law on all counts and the Court should deny summary judgment to the County Boards and Intervenors.

## ARGUMENT

### I.    Plaintiffs have Article III standing for their claims against Lancaster County and Berks County Boards of Elections.

The unrefuted evidence and settled authorities submitted with Plaintiffs' motion for summary judgment establish that (1) Plaintiffs suffered an injury as a result of the County Boards' rejection of undated or incorrectly dated ballots (collectively, "undated ballots"); (2) such injury is fairly traceable to the County Boards; and (3) a favorable judicial decision will likely redress

those injuries. *See Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017). Plaintiffs have members or constituents in both counties whose votes are at risk as a result of the Date Provision, CSMF ¶¶ 104–05, 113–15, 121; SAMF ¶¶ 1–3, and furthermore must divert time and resources away from other projects to learn how each county applies the Date Provision and assist their members to avoid disenfranchisement, CSMF ¶¶ 99–103, 110–12, 122–23.

Despite rejecting a combined total of over 1,000 ballots cast by eligible Pennsylvanians, the Lancaster and Berks County Boards of Election contend that they have caused no injury sufficient to establish standing. Their improbable assertion misapplies the relevant standards and ultimately unravels in the face of Plaintiffs' unrefuted testimony establishing that Organizational Plaintiffs DSCC, DCCC, and AFT Pennsylvania (the "Federation") have standing to bring claims against all Defendants, including the County Boards.

### A. DSCC, DCCC, and the Federation have associational standing to bring claims on behalf of their members and constituents.

To establish associational standing, an organizational plaintiff must show that: (1) their members and constituents "otherwise have standing in their own right," (2) "the interests [the organizations] seek[] to protect are germane to [their] purpose," and (3) the members and constituents' participation is unnecessary to resolve Plaintiffs' claims. *Citizens Coal Council v. Matt Canestrale Contracting, Inc.*, 40 F. Supp. 3d 632, 636–37 (W.D. Pa. 2014) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Lancaster and Berks Counties do not directly challenge Plaintiffs' satisfaction of any of these three elements but instead argue that DSCC, DCCC, and the Federation (the "Organizational Plaintiffs") lack standing on the sole basis that they have failed to identify a specific member that has suffered or will suffer harm because of the Date Provision. ECF No. 280 at 3–4. That is incorrect. All three organizations have identified injured members or constituents, CSMF ¶¶ 80, 121, and both Lancaster and Berks Counties have

admitted to disenfranchising more than a thousand voters collectively in the 2022 general election because of the Date Provision. *See* CSMF ¶¶ 8–10; Pls' Appendix of Exhibits, ECF No. 290, ("CSMF App.") at App.273 (Berks County admitting they set aside "782 ballots" because of the Date Provision), App.396 (Lancaster County admitting they "segregated and/or set aside 232 mail ballots" because of the Date Provision).[1] And because these counties have committed to enforcing the Date Provision in future elections, Organizational Plaintiffs' members and constituents will remain at risk of having their mail ballots rejected.

DSCC, DCCC, and the Federation additionally have third-party standing to protect the rights of their members and constituents in each county. The Third Circuit has recognized that a plaintiff may have standing to assert a non-party's rights where "the party asserting the right has a close relationship with the person who possesses the right [and] there is a hindrance to the possessor's ability to protect his own interests." *Tineo v. Attorney General of the United States*, 937 F.3d 200, 209 (3d Cir. 2019) (quoting *Sessions v. Morales-Santana*, 582 U.S 47, 57 (2017)). For example, "doctors may be able to assert the rights of patients; lawyers may be able to assert the rights of clients; vendors may be able to assert the rights of customers; and candidates for public office may be able to assert the rights of voters." *Pa. Psych. Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288 n.10 (3d Cir. 2002). Organizational Plaintiffs satisfy each of the three prerequisites for third party standing, *see id.* at 288-289: they are injured by enforcement of the Date Provision, *see* CSMF ¶¶ 99–103, 110–12, 122–23; SAMF ¶¶ 1–3; each Plaintiff has a close relationship with its members and constituents, *see* CSMF ¶¶ 93, 95–97, 104–05, 108–09,

---

[1] Of those hundreds of ballots, the specific voter identities were designated as Confidential Information pursuant to the Court's Protective Order. ECF No. 224. The contents of those ballots—such as the completed ballots themselves, indicating who those individuals actually voted for—were neither requested nor produced.

113–19; and these individuals cannot protect their interests because they cannot determine in advance whether they will forget to date—or incorrectly date—their mail ballot envelope and may not learn of the deprivation of their rights until it is too late, CSMF ¶¶ 8–28, 46–51, 81–90. Plaintiffs therefore have third-party standing to assert the claims of their members and constituents who may inadvertently fail to comply with the Date Provision in future elections. *Cf. June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2173–74 (2020) (Gorsuch, J., dissenting) (recognizing that controlling opinion allowed abortion providers third-party standing to "assert the constitutional rights of an undefined, unnamed, indeed unknown, group of women who they hope will be their patients in the future"), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

       **B.**      **The Organizational Plaintiffs have direct standing to sue over their own injuries caused by Lancaster and Berks Counties.**

Putting aside the injuries suffered by their members and constituents, Organizational Plaintiffs have direct standing because Lancaster and Berks Counties' actions "impair[] [Plaintiffs'] ability to carry out [their] mission," resulting in a diversion of resources. *Fair Hous. Rts. Ctr. in Se. Pa. v. Post Goldtex GP, LLC*, 823 F.3d 209, 214 n.5 (3d Cir. 2016); *see also Alexander v. Riga*, 208 F.3d 419, 427 n.4 (3d Cir. 2000). Lancaster and Berks Counties attempt to evade responsibility for any diversion of resources by claiming that they are not responsible for the Date Provision. ECF No. 280 at 5. But as discussed, both counties—along with every other county in Pennsylvania—have admitted that they have refused to count undated or incorrectly dated mail ballots and will continue to do so in future elections. *See* CSMF ¶¶ 8–10; CSMF App. at App.273, App.396. Thus, their actions have directly caused (and will continue to cause) the disenfranchisement of Organizational Plaintiffs' members and constituents, and consequently the resulting diversion of Organizational Plaintiffs' resources. *See Freeman v. Corzine*, 629 F.3d 146,

153 (3d Cir. 2010) (recognizing that to show causation, a plaintiff need only show their injury is "fairly traceable" to the challenged conduct, and even "an indirect causal relationship will suffice," *id.* (quotation omitted)).

The Counties also claim—without support—that because the Date Provision is "already in place and ha[s] already been used in one election," there is no diversion of resources. ECF No. 280 at 6. But as discussed in Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, the threat of disenfranchisement caused by Defendants' enforcement of the Date Provision is ongoing, and will continue to force Organizational Plaintiffs to divert resources in the form of personnel, time, and money away from existing activities such as get-out-the-vote programs, advocacy efforts, or helping voters in other states cure their ballots, and instead toward helping their constituents and members in Pennsylvania ensure their vote is ultimately counted and not set aside because of the Date Provision. CSMF ¶¶ 91–103, 106–12, 115, 117–23. The fact that Organizational Plaintiffs have already been harmed by the Date Provision in a previous election does not prevent them from seeking a remedy to prevent future injury.

Whether asserting claims directly or on behalf of their members and constituents, each Organizational Plaintiff has more than adequately alleged standing to bring claims against Lancaster and Berks Counties.

## II. Plaintiffs have a private right to enforce the Materiality Provision of the Civil Rights Act.

Intervenors misrepresent both the text of the Civil Rights Act and the relevant case law to argue that Plaintiffs lack a private right to enforce the Materiality Provision. This argument fails because a private right of action is unequivocally provided through 42 U.S.C. § 1983. *See Migliori*, 36 F.4th at 162; *see also Schwier*, 340 F.3d at 1297; *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2022 WL 3045657, at *29–30 (W.D. Tex. Aug. 2, 2022); *League of Women*

*Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021); *Tex. Democratic Party v. Hughs*, 474 F. Supp. 3d 849, 859–60 (W.D. Tex. 2020), *rev'd on other grounds by Tex. Democratic Party v. Hughs*, 860 F. App'x 874 (5th Cir. 2021). And if a statute "unambiguously confers an individual right," Plaintiffs presumptively may enforce it through Section 1983. *Migliori,* 36 F.4th at 159.

The Materiality Provision easily meets this standard because it has "an unmistakable focus" on the individual right to vote. *Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 528 (3d Cir. 2009). Specifically, the Materiality Provision prohibits denying "any individual" the right to vote based on "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting" that is "not material in determining whether such individual is qualified . . . to vote." 52 U.S.C. § 10101(a)(2)(B). As the Third Circuit explained, by "plac[ing] all citizens qualified to vote at the center of its import and provid[ing] that they shall be entitled and allowed to vote," this language "unambiguously confers a personal right." *Migliori*, 36 F.4th at 159 (cleaned up).

In this respect, the Materiality Provision's language is "clearly analogous" to Title VI of the Civil Rights Act, 42 U.S.C. § 2000d ("No person in the United States shall on the ground of race, color, or national origin . . . be subjected to discrimination . . .") and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex . . . be subjected to discrimination . . ."), which contain epitomic rights-creating language. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 & n.3 (2002) ("We have recognized, for example, that Title VI … and Title IX … create individual rights because those statutes are phrased 'with an *unmistakable focus* on the benefited class.'") (emphasis in original); *see also Schwier*, 340 F.3d at 1291, 1296 (finding the Materiality Provision conferred a private right

enforceable through Section 1983). Like Titles VI and IX, the Materiality Provision's "No person . . . shall" formulation targets "the denial of rights to individuals," creating an unmistakable federal right. *Schwier*, 340 F.3d at 1291, 1296. "Indeed, the rights-creating language here may be even stronger" than that of Titles VI and IX because the Materiality Provision "explicitly include[s] the word 'right.'" *Grammer*, 570 F.3d at 531; *see also Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 524 (1990) (finding Medicaid Act provision that *required states* to provide for payment of medical services for needy individuals using reasonable rates conferred private rights on medical providers); 52 U.S.C. § 10101(a)(2)(B) (protecting the "*right* of any individual to vote" (emphasis added)).

Because the Materiality Provision unambiguously confers an individual right to voters, it is presumptively enforceable through Section 1983 and Intervenors have the burden to demonstrate that Congress intended to exclude the possibility of a private right of action by identifying either "express terms" in the statute foreclosing private enforcement or a "comprehensive remedial scheme" that is more restrictive than Section 1983. *See Gonzaga Univ.*, 536 U.S. at 284; *Grammer*, 570 F.3d at 532. While Intervenors point to language enabling the Attorney General to bring suit to enjoin violations of the Materiality Provision, this "is inadequate, without more, to rebut the presumption of a private right of action under § 1983." *Migliori*, 36 F.4th at 162; *see also Schwier*, 340 F.3d at 1294–96 (holding that the Attorney General's authority to enforce the Materiality Provision does not preclude private enforcement). Indeed, the primary case they cite in support actually undermines their argument. In *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005), the Supreme Court considered whether Section 332(c)(7) of the Telecommunications Act was enforceable through § 1983. In determining that it was not, the Supreme Court identified "the dividing line between those cases in which we have held that an action would lie under § 1983 and

those in which we have held that it would not": "the existence of a more restrictive *private remedy* for statutory violations." *City of Rancho Palos Verdes*, 544 U.S. at 121 (emphasis added). Intervenors do not (and cannot) identify any such remedial scheme here.

The Supreme Court has further made clear that it does not "lightly conclude that Congress intended to preclude reliance on § 1983" and in the very few instances where it has, "the statutes at issue required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies prior to filing suit," and they involved "unusually elaborate, carefully tailored, and restrictive enforcement schemes." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 254-55 (2009) (internal quotations omitted). Section 101 of the Civil Rights Act bears no resemblance to these schemes; to the contrary, the statutory text contemplates private litigation by explaining that federal courts "shall exercise" jurisdiction over "proceedings instituted pursuant to [the statute]" regardless of whether "the party aggrieved shall have exhausted any administrative or other remedies," 52 U.S.C. § 10101(d).

The legislative history also confirms that Congress intended for the Materiality Provision to remain enforceable through § 1983 actions. In the House Report accompanying the bill establishing the Attorney General's enforcement authority, the Judiciary Committee recognized that "Section 1983 of Title 42 U.S.C. has been used to enforce the rights, legislatively declared in the existing law." H.R. Rep. No. 85-291 (1957). The addition of public enforcement by the Attorney General was intended "to provide means for *further* securing and protecting the right to vote," *id.*, in recognition that "deprivation of the right to vote is the first step on the road to tyranny and dictatorship" and therefore "the right of franchise must be protected by the sovereign," *id.* As the Eleventh Circuit has recognized, "[t]his language demonstrates an intense focus on protecting the right to vote and does not support the conclusion that Congress meant

merely to substitute one form of protection for another." *Schwier*, 340 F.3d at 1295.

Intervenors' position furthermore is not supported by any meaningful authority. Three federal appellate courts have considered whether the Materiality Provision is enforceable through § 1983: The Third Circuit in *Migliori* and the Eleventh Circuit in *Schwier* thoroughly analyzed the issue, evaluating the text, structure, and history of § 10101 to conclude that it could be enforced through a § 1983 action. Intervenors acknowledge *Schwier* but make no effort to engage with the Eleventh Circuit's reasoning (or with the Third Circuit's reasoning in *Migliori*). Instead, they rely on the Sixth Circuit's opinion in *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016) ("*NEOCH*"). That opinion does not engage with the merits at all; the panel instead briefly discusses the Eleventh Circuit's reasoning in *Schwier* but acknowledges the binding effect of a previous Sixth Circuit decision. *See NEOCH,* 837 F.3d at 630. That previous decision— *McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000)—devotes exactly ten words to the issue.

The careful and extensive review of the Third Circuit in *Migliori* and the Eleventh Circuit in *Schwier*, including detailed consideration of the text, structure, and history of the Civil Rights Act, stand in stark contrast to the Sixth Circuit's cursory analysis. Intervenors offer no argument that warrants departure from these courts' thorough analyses.

## III. The Date Provision violates the Materiality Provision.

There are no factual disputes as to whether the Date Provision violates the Materiality Provision; instead, Intervenors advance legal arguments that ignore the text of the statute in favor of hyperbolic claims about the implications of enforcing the statute as written. Because each of their arguments fails, they are not entitled to summary judgment. Judgment instead should be granted to Plaintiffs for the reasons discussed in Plaintiffs' motion. *See* ECF No. 288.

The Materiality Provision makes it unlawful to:

deny the right of any individual to vote in any election because of an error or

10

> omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B). Congress enacted this provision to rid the country of state laws "that increase the number of errors or omissions on papers or records related to voting and provide an excuse to disenfranchise otherwise qualified voters." *Thurston*, 2021 WL 5312640, at *4. As remedial legislation, the Materiality Provision must be "liberally construed." *Peyton v. Rowe*, 391 U.S. 54, 65 (1968).

The Materiality Provision's text consists of three clauses, giving rise to a three-element claim. The first two clauses identify the universe of voting regulations to which the Materiality Provision applies. Clause 1 requires that the regulation result in the "den[ial of] the right of any individual to vote." 52 U.S.C. § 10101(a)(2)(B). Clause 2 requires that the cause of that denial be "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting." *Id.* Meanwhile, Clause 3 creates the test for determining the regulation's legality: If the "error or omission is not material in determining whether such individual is qualified under State law to vote in such election," enforcement of the regulation is unlawful. *Id.* Intervenors argue that rejecting undated or misdated ballots does not violate any of these elements: they claim that the first element is not satisfied because refusing to count a noncompliant ballot does not deprive anyone of the right to vote, ECF No. 282 at 6; that the second element is not satisfied because the Materiality Provision only "regulates requirements and practices related to qualifications and registration to vote, not rules 'that must be met in order to cast a ballot that will be counted,'" *id.* at 8 (quoting *Ritter,* 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay)); and that the third element is not satisfied because casting a mail ballot is voting rather than an act requisite to voting, *id.* at 12. These theories share the same fatal flaw: They are incompatible with the text of the statute.

**A.     The County Boards' enforcement of the Date Provision results in a denial of the right to vote.**

The Date Provision's requirement that county boards reject a mail ballot due to a missing or incorrect written date on its envelope unquestionably denies the right to vote, which includes not only the ability to "cast a ballot," but also to "*have it counted*." *United States v. Classic*, 313 U.S. 299, 318 (1941) (emphasis added). Congress wrote this understanding directly into the Materiality Provision, explicitly defining the word "vote" as used in the Provision to encompass "all action[s] necessary to make a vote effective, including . . . having [a] ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(e); *id.* § 10101(a)(3)(A) (incorporating this definition for purposes of the Materiality Provision's use of the term "vote"). By prohibiting county boards from counting otherwise valid mail ballots due to a missing or incorrect written date on the envelope, the Date Provision denies the right to vote as Congress has explicitly defined that term.

This statute's definition of the term "vote" also forecloses Intervenors' self-refuting argument that the Date Provision's enforcement does not violate the Materiality Provision because "[t]he consequence of . . . noncompliance is not disqualifying the voter, stripping the voter's eligibility to vote, or removing the voter from the list of registered voters, but rather declining to count the voter's (invalid) ballot." ECF No. 282 at 7. Applying the plain text of the Materiality Provision, courts have repeatedly found that it applies to state laws that, like the Date Provision here, do not stand in the way of a voter casting a ballot but instead require rejecting that ballot after submission because of a mistake or omission made by the voter. *See Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, No. 1:21-CV-01284-JPB, 2021 WL 6495360, at *14 (N.D. Ga. Dec. 9, 2021) (finding plaintiffs stated a plausible Materiality Provision claim in challenge against requirement that absentee voters write their birth date on their absentee ballot envelope); *Thurston*,

2021 WL 5312640, at *4 (finding plaintiffs stated a plausible Materiality Provision claim in challenge against requirement that absentee voters who have already demonstrated their eligibility to provide similar evidence with their absentee ballot as well); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1309 (N.D. Ga. 2018) (enjoining county from rejecting absentee ballots due to voter's failure to write correct year of birth on envelope because doing so likely violates the Materiality Provision); *Ford v. Tenn. S.*, No. 06-2031-DV, 2006 WL 8435145, at *11 (W.D. Tenn. Feb. 1, 2006) (explaining Materiality Provision prohibits rejecting a voter's ballot envelope because of the voter's failure to sign both ballot and poll book). Intervenors meanwhile fail to cite a single decision that relies upon their atextual theory.

**B.     The Date Provision relates to an application, registration, or other act requisite to voting.**

The Date Provision prohibits rejecting a ballot "because of an error or omission on *any* record or paper relating to *any* application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). It requires counties to reject mail ballots due to an "omission" (failing to write the date) or "error" (writing the wrong date) made by the voter on a "paper" (the envelope) relating to an "act requisite to voting" (completing the voter declaration). *Id.*

Intervenors seek to rewrite the Materiality Provision by arguing that it should apply only when "the error or omission affect[s] a 'determin[ation] whether such individual is qualified under State law to vote.'" ECF No. 282 at 8 (quoting 52 U.S.C. § 10101(a)(2)(B)); *see also id.* at 9-10. This argument badly misconstrues the statutory text and has been rejected by other courts. *Ford*, 2006 WL 8435145, at *11 (rejecting same argument that the Materiality Provision applies "solely [to] determining eligibility to vote"). It is Clauses 1 and 2 of the Materiality Provision, not Clause 3, that delineate the *type* of voting regulation governed. And their plain text makes clear that the Provision applies to any regulation that denies the right to vote "because of an error or omission

13

on any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B).

This is why, in *Migliori*, the Third Circuit determined that the Materiality Provision "applies" to the Date Provision by asking only whether "mail-in ballot[s] [] constitute[] a paper relating to an act for voting." 36 F.4th at 162 n.56. Having found that the Date Provision "squarely" does so, the court moved on to Clause 3's test, which determines not whether a regulation falls within the Materiality Provision's ambit, but instead whether the regulation is lawful. *Id.* at 163–64. Under that test, if the omission or mistake at issue is "material in determining whether such individual is qualified under State law to vote in such election," the regulation's enforcement is lawful; if it is immaterial, enforcement is unlawful. 52 U.S.C. § 10101(a)(2)(B). As explained below, the *Migliori* court easily concluded (and Intervenors concede) that the Date Provision fails that test.[2]

If Congress had intended to limit the Materiality Provision to papers and records used to determine a person's eligibility, it would have stated that it applies only to papers and records relating to *registration*, the phase during which election officials determine a voter's eligibility. *See Thurston*, 2021 WL 5312640, at *4; *see also* SAMF ¶¶ 4–5. But Congress did the opposite, using expansive language making clear that the Materiality Provision's scope applies to *any* record

---

[2] Intervenors claim that *Migliori* is not persuasive authority because it was vacated as moot, and that therefore "[t]he Court should not rely on that analysis," but the Third Circuit has confirmed that an opinion vacated on non-merits grounds remains highly persuasive. *See Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 356 (3d Cir. 2017) ("Although our judgment . . . was vacated by the Supreme Court, it nonetheless sets forth the view of our Court. . . . [The Supreme Court] vacated our judgment, . . . but did not attack our reasoning. . . . While [the vacated opinion] is no longer controlling, there is nothing that would require us—or anyone else—to conclude that our reasoning in that opinion was incorrect."). Intervenors' attack on *Migliori*'s persuasive value furthermore rings hollow given that their brief cites Justice Alito's *Ritter* dissent on behalf of only three justices at least a dozen times. *See* ECF No. 282 at 1, 4, 6–9, 12–13.

or paper relating not only to "registration," but "any . . . *other* act requisite to voting." 52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (noting Supreme Court precedent that "[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'"). To accept Intervenors' reading of the statute would render that last phrase superfluous. *See Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998) ("In interpreting a statute, courts should endeavor to give meaning to every word which Congress used and therefore should avoid an interpretation which renders an element of the language superfluous."). If Congress intended to circumscribe the Materiality Provision to constrain its scope only to instances when state actors use the information provided to determine a voter's eligibility, "it would have said so." *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 128 (2016). Not only did Congress *not* adopt this restriction, it included language making clear that it intended the Provision to have a much broader reach. The plain text of the statute forecloses Intervenors' theory.

Intervenors also exaggerate the consequences of Plaintiffs' interpretation of the Materiality Provision, suggesting that it would prevent states from enacting "*any* requirements for completing ballots . . . that do not confirm the individual's qualifications to vote." ECF No. 282 at 13. But the examples they offer to demonstrate this point fall flat because it remains unclear why any of them would violate the Materiality Provision's plain text the way the Date Provision does. Intervenors fail to explain, for example, why the requirements that voters place their mail ballot in a secrecy envelope, *id.* at 14 (citing 25 P.S. §§ 3146.6(a), 3150.16(a)), or appear at a polling place before the polls close amount to "error[s] or omission[s] *on* any record or paper" as required to trigger the Materiality Provision. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). And when a county board declines to count an overvote,  ECF No. 282 at 14, it does not deny that voter the ability to vote;

15

rather, it effectuates the voter's ballot to the fullest practicable extent. *See* 25 P.S. § 3063(a) ("the ballot shall be counted for all offices for which it is properly marked"). Indeed, Intervenors fail to identify a single example of another instance in which the basic, textual application of the Materiality Provision would invalidate other state voting laws.

Finally, Intervenors attempt to drag the Date Provision outside of the Materiality Provision's scope by claiming that "casting a ballot . . . constitutes the *act* of voting, not an . . . act *requisite* to voting." ECF No. 282 at 11-12. But this argument immediately falls apart in light of Intervenors' simultaneous admission that "casting a ballot . . . *requires* completing the declaration." *Id.* at 11 (emphasis added). If a voter is required to complete the declaration to cast a ballot, completing the declaration is an act requisite to voting. In any event, this imagined distinction cannot be squared with the statutory text. As explained, the Materiality Provision expressly defines "vote" as including "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." 52 U.S.C. § 10101(a)(3)(A), (e).

### C. The handwritten date on a mail ballot's outer envelope is unrelated to the voter's qualifications.

Intervenors effectively concede the third element of Plaintiffs' Materiality Provision claim. As they explain, "Plaintiffs are entirely correct that compliance with the date requirement is not a qualification to vote." ECF No. 282 at 13. A person is eligible to vote in Pennsylvania if they are at least 18 years old on the day of the next election, have been a citizen of the United States for at least one month before the next election, and have resided in the Pennsylvania election district where they plan to vote for at least 30 days prior to the next election, provided they have not been convicted of a felony within the last five years. 25 P.S. § 2811; 25 Pa. C.S.A. § 1301(a). As the *Migliori* court unanimously concluded (and Intervenors do not dispute), a voter's failure to write

a correct date on the envelope containing their mail ballot has nothing to do with their qualifications to vote. 36 F.4th at 163; *see also* ECF No. 282 at 13 ("[T]he date requirement is not used to determine whether an individual is 'qualified under State law to vote.'"). Nor do any of the defendant county board of elections rely upon it to determine whether a ballot was timely submitted. Rejecting mail ballots on this ground plainly violates the Materiality Provision.

## IV.     The Date Provision violates the First and Fourteenth Amendments under the *Anderson-Burdick* test.

Not only is the Date Provision immaterial to voter qualifications, it also fails to advance any sufficiently weighty state interest and thus violates the First and Fourteenth Amendments. When considering such challenges to state election laws, courts apply the *Anderson-Burdick* balancing test, which weighs the character and magnitude of the burdens imposed against the precise interest that Defendants claim warrants that burden. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019). Because the Date Instruction serves no legitimate purpose in the voting process, the significant burdens imposed by its enforcement are unjustifiable and create unlawful barriers to the franchise.

### A.     Rejecting mail ballots implicates the fundamental right to vote.

At the outset, Intervenors ask the Court to reject the *Anderson-Burdick* test entirely because the Date Provision regulates only absentee and mail-in voting and therefore purportedly does not implicate a fundamental right. ECF No. 282 at 17. In support of this argument, Intervenors cite *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 807–08 (1969), a case that pre-dates *Anderson* itself—and by extension the *Anderson-Burdick* test that courts apply

today. But Intervenors' reliance on *McDonald* to rewrite the *Anderson-Burdick* test suffers from another fundamental flaw: *McDonald* did not insulate absentee voting restrictions from adherence to the constitutional right to vote. *McDonald* simply required the Court to determine whether unsentenced inmates awaiting trial met one of the four *qualifications* under which absentee ballots were provided by Illinois law, with the Court concluding that they could not show they qualified as "physically incapacitated." *Id.* at 803–05, 809–10; *see also O'Brien v. Skinner*, 414 U.S. 524, 529 (1974) ("Essentially the Court's disposition of the claims in *McDonald* rested on failure of proof."); *Goosby v. Osser*, 409 U.S. 512, 520–22 (1973) (finding that *McDonald* suggested different result if plaintiffs had presented evidence that the state was effectively preventing them from voting). And since *McDonald*, the Supreme Court has acknowledged that restrictions on absentee voting *can* impose burdens that violate the Equal Protection Clause. *See Am. Party of Tex. v. White*, 415 U.S. 767, 794 (1974); *O'Brien*, 414 U.S. at 530.

The Supreme Court has also been clear that there are *no litmus tests* dividing appropriate restrictions from invalid ones under its *Anderson-Burdick* framework. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008). In every case, the court must take a hard look at the evidence and determine whether the burdens imposed by the restrictions are justified by the specific interests set forth by the state. *Anderson*, 460 U.S. at 789-90. To accept Intervenors' argument would be to find that there *is* a broad litmus test shielding a wide array of restrictive voting laws—governing absentee or mail-in voting—from review entirely, a view that the Supreme Court has never endorsed since announcing the *Anderson-Burdick* test. That is why courts have consistently applied the *Anderson-Burdick* test to "a wide range of electoral-process regulations," including "absentee voting, early voting, . . . [and] the counting of ballots[.]" *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 140–41 (3d Cir. 2022) (collecting cases).

Here, Plaintiffs provided myriad, undisputed evidence that Defendants' enforcement of the Date Provision has resulted in rejection of otherwise valid ballots and they have committed to do the same in future elections, which burdens the constitutional right to voter.

**B.    Defendants' enforcement of the Date Provision imposes a serious burden on Pennsylvanians' right to vote.**

In the 2022 general election, Defendants rejected more than 10,000 otherwise valid and timely received ballots simply because of a missing or incorrect date on the ballot's outer envelope. CSMF ¶ 10. Courts have consistently held that disenfranchisement for failure to comply with technical requirements, like the Date Provision, imposes a serious burden on the right to vote. *See, e.g.*, *NEOCH*,  (holding that rejecting mail ballots based on voters' failure to write their birthday and address with "technical precision" imposed unjustified burden); *Democratic Exec. Comm. Of Fla.,* 915 F.3d at 1319 (recognizing that absentee ballot signature matching requirement imposed burden of a "risk of disenfranchisement" from a perceived signature mismatch). And courts regularly include the costs of noncompliance with a challenged provision—in this case, being disenfranchised—in their *Anderson-Burdick* analysis of the provision's burden. *See, e.g.*, *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1319–20; *Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876 (1997); *NEOCH*, 837 F.3d at 631–34.

Despite the fact that Defendants' past and future enforcement of the Date Provision has disenfranchised thousands of eligible voters, Intervenors claim that the Date Provision imposes no more than the "usual burdens of voting" such as obtaining a photo identification. ECF No. 282 at 18–21. But there is nothing "usual" about the Date Provision: it requires voters to effectively guess which format their county boards of elections will use, which varies by county and is not explicitly defined anywhere. *See* CSMF ¶¶ 7, 15, 17–18, 25, 27. If voters fail to replicate that format, they must then either follow their county's specific "cure" procedures (which, if their county even

allows curing in the first instance, may require last-minute travel, *see* CSMF ¶¶ 83–88) or simply not have their vote counted. As the Sixth Circuit recognized in *Northeast Ohio Coalition for the Homeless v. Husted*, even a "burden [that] is small for most voters" may impose an impermissible burden when "none of the precise interests put forward by [the state] justifies it." 837 F.3d 612, 632 (6th Cir. 2016) (quotation omitted); *see also Crawford*, 553 U.S. at 199 (recognizing possibility that "heavier burden may be placed on a limited number of persons").

>   **C.      The Date Provision does not serve any state interest.**

To survive scrutiny under the *Anderson-Burdick* analysis, the burden, "[h]owever slight," "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (controlling op.) (internal quotations omitted). The Date Provision fails this test because—unlike the photo identification requirement in *Crawford* or the signature requirement—the Date Provision serves no relevant or legitimate state interest.

While Intervenors claim the Date Provision prevented voter fraud on a single ballot in Lancaster County where the handwritten date post-dated the date the decedent had passed away, this assertion is not supported by the evidence. ECF No. 282 at 19–20. As Lancaster County Board of Elections admitted in deposition testimony, that fraudulent ballot would not have been counted under any circumstance because the deceased had already been removed from the voter rolls before the ballot was received. CSMF ¶ 73; *Chapman v. Berks Cnty. Bd. of Elections*, No. 355 M.D. 2022, 2022 WL 4100998, at \*21 n.14 (Pa. Cmwlth. Aug. 19, 2022) ("the ballot at issue had already been separated by the chief clerk because the scan of the return envelope revealed, through the SURE system, that the elector was deceased"); *see also* CSMF ¶ 74; 25 Pa. C.S.A. § 1505(a) ("The Department of Health shall . . . send the name and address of residence of that [deceased] individual to [voter registration] commission . . . [and] [t]he commission shall promptly update information contained in its registration records."). And as Lancaster County Board of Elections and other

county boards have admitted, election officials do *not* rely on the handwritten date for any purpose other than merely determining that the mail ballot itself complies with the Date Provision—a tautological technical requirement that is unconnected to any legitimate state interest. CSMF ¶¶ 65–68, 76–79.

Intervenors' repetition of the proposed justifications for the Date Provision expressed in a 2020 case before the Pennsylvania Supreme Court—which the court considered on an expedited timeline in the immediate aftermath of the 2020 election—also ignores critical (and undisputed) evidence, along with the comprehensive analysis of election procedures developed since that time, which shows that the Date Provision does not actually serve any of those purported interests. *See* ECF No. 266 at 20–21 (citing *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020) ("*In re 2020 Canvass*"), *cert. denied sub nom. Donald J. Trump for President, Inc. v. Degraffenreid*, 141 S. Ct. 1451 (2021)). No county board uses the handwritten date to determine a voter's qualifications. CSMF ¶¶ 31–32; SAMF ¶¶ 4–5. That date does not serve to ensure timely receipt of mail ballots. CSMF ¶¶ 52–64. It does not serve to detect or prevent fraud. CSMF ¶¶ 65–75. And it serves no other purpose whatsoever, other than mere compliance with the Date Provision itself. CSMF ¶¶ 76–79. *See also* ECF No. 288 at 22–24.

Perhaps sensing the lack of any evidence supporting those interests, Intervenors for the first time advance a new purported state interest—that of "solemnity"—in claiming that adding technical formalities to casting a ballot encourages "deliberation" and "considered decisions." ECF No. 282 at 20–21.[3] But such a purely hypothetical interest is not sufficient to justify the Date

---

[3] Notably, at no point in litigation in any court has the Commonwealth of Pennsylvania claimed

Provision's specific burden, which disenfranchises thousands of voters. *See Belitskus v. Pizzingrilli*, 343 F.3d 632, 645 (3d Cir. 2003) (requiring evaluation of "precise interests," including "the extent to which those interests make it necessary" to justify the burden (quoting *Anderson,* 460 U.S. at 789)). It defies logic to claim that needless "formalities" are self-justifying by encouraging "considered decisions" when one such formality is singularly responsible for over 10,000 votes not being counted. ECF No. 282 at 20–21; *see also* CSMF ¶ 10. Nor have Intervenors provided any evidence at all to show that the Date Provision has any effect on promoting more voter contemplation. In reality, the Date Provision needlessly strips voters of their voice due to a technical error; it does not empower them to cast a wiser ballot.

Intervenors also claim for the first time—and again without evidence—that the Date Provision advances a state interest in "safeguarding voter confidence" in Pennsylvania elections. ECF No. 282 at 23 (quoting *Crawford,* 553 U.S. at 191). But such a nebulous interest cannot justify the severe burden of disenfranchising thousands of eligible voters for a purely technical requirement. *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1132–33 (10th Cir. 2020) (recognizing asserted state interests as "legitimate in the abstract" but rejecting that "those interests make it necessary to burden the plaintiff's rights"); *see also Ohio State Conf. of N.A.A.C.P. v. Husted*, 768 F.3d 524, 545 (6th Cir. 2014) ("the state must articulate specific, rather than abstract state interests, and explain why the particular restriction imposed is actually necessary"), *vacated on other grounds sub nom. Ohio State Conf. of NAACP v. Husted*, No. 14–3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014); *Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 421 (2d Cir.

---

that the interest in "solemnity," or any other state interest, is furthered by the Date Provision. To the contrary, the Commonwealth forcefully argued before the Third Circuit that the requirement serves no valid state interest and should be struck under the Materiality Provision. *See* Amicus Br. of the Commw. of Penn. In Support of Appellants and Reversal at 7, *Migliori v. Lehigh County*, No. 22-1499, 2022 WL 1045074 (3d Cir. Apr. 1, 2022), Dkt. No. 42.

2004) ("that the defendants' asserted interests are important in the abstract does not necessarily mean that its chosen means of regulation will in fact advance those interests") (cleaned up). After all, voter confidence includes the confidence in "ensur[ing] qualified voters were not disenfranchised by meaningless requirements[.]" *Migliori*, 36 F.4th at 164. In that respect, the Date Provision only undermines voter confidence.

Finally, Intervenors attempt to tie the Date Provision to signature requirements, which are not at issue in this action. ECF No. 282 at 13–15, 19–23. The two requirements differ in several important ways, not least of which being that while county boards have conceded that the Date Provision serves no purpose, they have not made similar concessions about the signature requirement. *See, e.g.*, CSMF ¶¶ 31–32, 54, 57–68, 71–72, 74–79. And while the signature on a declaration may purport to confirm a voter's identity, no similar claim can be made regarding the handwritten date, which has nothing to do with identifying a voter or determining whether they are qualified to vote. CSMF ¶¶ 31–32.[4]

### D. Plaintiffs' expert testimony shows that the Date Provision disproportionately burdens racial minorities and older voters.

The fact that the Date Provision burdens voters is illustrated through the analysis of Plaintiffs' expert, Dr. Hopkins, which shows that certain groups of voters—namely Black, Hispanic, and older voters—were disproportionately disenfranchised because of the Date Provision. CSMF ¶¶ 33–43. Using the well-established "cost of voting" framework, Dr. Hopkins showed a "***statistically significant***" relationship between the number of Black or Hispanic residents in a given county and the rate of rejected mail ballots in that county, CSMF ¶¶ 35–37 (emphasis added), which means that this correlation is "extremely unlikely to have emerged by

---

[4] Intervenors claim that "Plaintiffs concede that the signature requirement is constitutional," ECF No. 282 at 19, but fail to provide any evidence of such an alleged concession. In any event, the signature requirement is beyond the scope of this action.

random chance alone." CSMF App. Ex. I ¶ 34. It also reveals that Defendants' enforcement of the Date Provision most heavily impacts the least resourced voter populations. *See also id.* at ¶¶ 11–14, 16, 48–49.

Intervenors miss the point of such analysis, claiming that Plaintiffs are relying on an abnormal burden specific to those groups. ECF No. 282 at 24. But if there were no burden at all associated with the Date Provision, then there would not be a statistically significant relationship between those groups of voters who are least resourced and the number of ballots rejected because of the Date Provision. CSMF App. Ex. I ¶ 34. In other words, Dr. Hopkins's robust group-level analysis shows that the Date Provision *actually burdens voters*, and Intervenors point to no authority that requires Plaintiffs to "calculate" or otherwise quantify the cost to individual voters as their brief suggests. ECF No. 282 at 24–25.[5]

Because Defendants' enforcement of the Date Provision imposes a serious burden by disenfranchising thousands of Pennsylvania voters for no legitimate state interest, it fails the *Anderson-Burdick* test and violates the First and Fourteenth Amendments.

## CONCLUSION

The Court should deny Defendants Lancaster County and Berks County's and Intervenors' motions for summary judgment.

---

[5] To the extent Intervenors demand that Dr. Hopkins quantify the cost to voters, their argument fundamentally misunderstands the cost of voting framework and contradicts the Supreme Court's admonition against the use of litmus tests and formulas in the *Anderson-Burdick* analysis. *See Crawford*, 553 U.S. at 191 (rejecting "litmus test for measuring the severity of a burden that a state law imposes"); *Mazo*, 54 F.4th at 146 (citing *Crawford*, 553 U.S. at 191).

Dated: May 5, 2023

Adam C. Bonin
**THE LAW OFFICE OF**
**ADAM C. BONIN**
121 South Broad Street, Suite 400
Philadelphia, PA 19107
Telephone: (267) 242-5014
Facsimile: (215) 827-5300
adam@boninlaw.com

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Justin Baxenberg*
Jacob D. Shelly*
Dan Cohen*
Daniela Lorenzo*
Omeed Alerasool*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
unkwonta@elias.law
jbaxenberg@elias.law
jshelly@elias.law
dcohen@elias.law
dlorenzo@elias.law
oalerasool@elias.law

* *Admitted Pro Hac Vice*