## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA
## ERIE DIVISION

BETTE EAKIN, *et al.*,

      Plaintiffs,

v.

ADAMS COUNTY BOARD OF ELECTIONS, *et al.*,

      Defendants.

Case No. l:22-cv-339-SPB

### AMICUS CURIAE BRIEF OF LAWYERS DEMOCRACY FUND
### IN SUPPORT OF SUMMARY JUDGMENT AGAINST PLAINTIFFS

Lawyers Democracy Fund (LDF) respectfully submits this *amicus* brief to assist the Court in understanding the legal theories presented by the parties.

### INTEREST OF AMICUS CURIAE[1]

Lawyers Democracy Fund (LDF) is a non-profit organization that promotes ethics, integrity, and professionalism in the electoral process. LDF works to ensure that all citizens can vote freely within an election system of reasonable procedures that promote election integrity, prevent vote dilution and disenfranchisement, and instill public confidence in election procedures and outcomes. To accomplish this, LDF conducts, funds, and publishes research and analysis regarding the effectiveness of current and proposed election methods. LDF is a resource for

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than the amicus and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

lawyers, journalists, policymakers, courts, and others interested in the electoral process. LDF also periodically engages in public-interest litigation to uphold the rule of law and election integrity and files *amicus* briefs in cases where its background, expertise, and national perspective may illuminate the issues under consideration. LDF submitted an amicus brief to the U.S. Supreme Court in *Ritter v. Migliori*, advocating for vacatur of the Third Circuit's unprecedented opinion in *Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022). LDF also submitted an amicus brief to the Supreme Court of Pennsylvania in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023), advocating that the state high court respect the policy judgments of the state's General Assembly and enforce the signature and date requirement for absentee ballots. Both courts ruled in favor of the positions advocated by LDF.

As LDF argued in the U.S. Supreme Court, the position advocated by the Plaintiffs would replace the well-established *Anderson-Burdick* test with an unprecedented and erroneous legal theory so broad in its import that it would invalidate an array of quotidian ballot-casting rules and open a Pandora's Box of novel legal challenges to reasonable election administration methods around the country. It also would countermand the Supreme Court's ruling in *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021). LDF is confident that these are the reasons why the U.S. Supreme Court vacated the Third Circuit's decision in *Migliori*, rather than Plaintiffs' suggestion that the decision was vacated solely on grounds of mootness. For these reasons, LDF's interest in preserving sound jurisprudence and reasonable regulation of election administration is directly implicated.

## SUMMARY OF THE ARGUMENT

The Plaintiffs' legal theory urges the Court to expand the reach of the "Materiality Provision" of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B), to the subject of ballot processing and validation, well beyond its intended application to voter qualification and registration.  This unreasonably expands the scope of the Materiality Provision of the Civil Rights Act.  Moreover, this expansive theory's complete lack of standards would illogically invalidate an array of essential state voting rules, leaving large gaps in state election administration.  These problems provided the Supreme Court solid substantive reasons for vacating the Third Circuit's unprecedented and poorly conceived decision in *Migliori*.

According to the Plaintiffs' theory, the Materiality Provision renders voter qualification the sole acceptable state interest in regulating ballots and prohibits virtually any regulation of how a qualified voter *casts a ballot*.  That theory would leave states no legitimate room to impose any mundane regulations on balloting such as marking ballots with pens or pencils (not crayons), utilizing a standard envelope to mail ballots, or signifying on absentee envelopes that a voting ballot is enclosed.  These and other rules are immaterial to determining a voter's qualifications to register but indispensable to sound election administration.  But, per Plaintiff's legal theory, they would be invalid.

The Supreme Court vacated the Third Circuit's decision in *Migliori* because the Materiality Provision does not apply to, much less prohibit, rules governing ballot casting.  It simply does not address ballot casting.  Rather, it addresses the process by which individuals show themselves qualified to vote.  As shown below, the Plaintiffs' theory's contrary view contravenes the statute's text and every applicable canon of construction, including the canon of constitutional avoidance.

# ARGUMENT

The Materiality Provision plainly speaks to the process by which individuals establish their qualifications to vote, not the process by which ballots are cast and counted. It reads, in relevant part:

> No person acting under color of law shall…(B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining **whether such individual is qualified under State law to vote** in such election.

52 U.S.C. §10101(a)(2)(B) (emphasis added).

This Materiality Provision targets "the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms," and it therefore "forbids a person acting under color of law to disqualify a potential voter because of his or her failure to provide unnecessary information on a voting application." *Schwier v. Cox*, 340 F.3d 1284, 1294, 1297 (11th Cir. 2003). Paradigmatic violations include "disqualifying an applicant who failed to list the exact number of months and days in his age," *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995), or striking applications containing "minor misspelling errors or mistakes in age or length of residence" or other "trivial reasons," H.R. Rep. No. 88-914 (Nov. 20, 1963), 1964 U.S.C.C.A.N. 2391, 2491.

By contrast, the Materiality Provision does not preempt laws governing ballot casting, such as rules governing how voters signify a vote, the number of candidates they may select, what utensils they use, where ballots may be deposited, and what information must accompany a mail-in ballot. Multiple interpretive indicators of text and context limit the Materiality Provision's reach to the registration process, not the ballot-casting process. For this reason, only

one court has ruled in favor of Plaintiffs' legal theory since passage of the Civil Rights Act of 1964, and that court ruling was summarily vacated by the Supreme Court.

## I.      Plaintiffs' Legal Theory Contravenes the Plain Text of the Statute.

The Materiality Provision reaches only records or papers that relate "to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B).  A ballot is not even arguably an "application" or "registration."

Plaintiffs sidestep that statutory language, however, by relying on the third element in the Materiality Provision's list arguing that a ballot is a paper relating to an act for voting.  But this rewrites the statute, which says "any *other* act requisite to voting." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). This catch-all phrase—"other"—links back to the more specific listed items— "application" and "registration"—and must be "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (citation omitted) (discussing the *ejusdem generis* canon). The terms in the list share a "common attribute," *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008), in focusing on voter registration.  The catch-all phrase anticipates that state actors may call that process something other than an "application" or "registration" and thwarts gamesmanship by sweeping in all functionally identical procedures.  By expanding it to reach any "paper relating to an act for voting," as the Third Circuit did in *Migliori*, 36 F.4th at 163 n.56, the Plaintiffs seek an erroneous expansion of the catch-all phrase beyond the attribute common to the list.

Plaintiffs' argument also overlooks that the catch-all phrase is not "act for voting," *id*., but "other act *requisite* to voting." 52 U.S.C. § 10101(a)(2)(B) (emphasis added).  The difference is material.  If it seems "awkward to describe the act of voting as 'requisite to the act of voting,'"

*Ritter v. Migliori*, 142 S. Ct. 1824, 1826 n.2 (2022) (Alito, J., dissenting from denial of stay application), that is because the modifier "requisite" refers to that which is "necessary…for the end in view," Webster's Third New International Dictionary 1929 (1993), not the end itself.  An act "requisite to" voting is not the same as voting any more than "the food requisite for the journey" is the same as the journey, *id*. (exemplar use of "requisite").

Subsection (e) of the same statute proves that Congress understood how these distinct voting-related events progress.  Subsection (e) defines the term "vote" to include both "registration or *other action* required by State law *prerequisite* to voting" as well as "casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(e) (emphasis added).  That is, Congress knew how to distinguish between registration and voting.  *See, e.g.*, *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 394 (2015).  It is significant not only that the Materiality Provision speaks only of the precursors to voting but also that it mimics subsection (e) in doing so: compare "application, registration, or other act requisite to voting" with "registration or other action required by State law prerequisite to voting."[2]  That Congress understood the difference between registration and other voting requisites, on the one hand, and casting a ballot and having it counted, on the other, evidences that, by referencing only the former, the Materiality Provision excluded the latter.[3]

---

[2] That the phrases are not exactly identical says less than their similarities, especially given that subsection (e) was enacted four years before the Materiality Provision and by a different Congress, *see* Civil Rights Act of 1960, Pub. L. 86–449, § 601, 74 Stat. 86, 90 (1960).

[3] The broad definition of "vote" in subsection (e) including both requisites to voting and voting itself, 52 U.S.C. § 10101(e), does not suggest otherwise. That definition indicates what the word "vote" means standing alone. But statutory provisions may use defined terms for their own purposes and so narrow their reach. A statute may define "automobile" to include a "motorized vehicle of any color," but the statutory phrase "green automobile" would still not reach a red pickup. So too here.

Indeed, Congress had no reason to employ the list "application, registration, or other act requisite to voting" if it intended the Materiality Provision to reach all voting-related papers, especially since subsection (e) already defined the term "vote" to include "all action necessary to make a vote effective including, but not limited to, registration…." 52 U.S.C. §10101(e); *see also id.* §10101(a)(2)(B) (adopting subsection (e)'s definition).  If Congress intended the theory pressed by Plaintiffs, that "result could quite easily have been obtained by saying something much simpler," *Stanovsek v. Holder*, 768 F.3d 515, 517 (6th Cir. 2014), such as that the right to vote may not be denied "because of an error or omission on any record or paper relating to voting."  If that is what Congress intended, it is curious that it used a "decidedly awkward way of expressing [that] intent" with a cumbersome three-part list. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989).

The Materiality Provision's focus on the voter qualification, not ballot-casting, process is confirmed in its core prohibition against "deny[ing] the *right* of any individual to vote," 52 U.S.C. § 10101(a)(2)(B) (emphasis added), not declining to count an absentee ballot cast by a person who is duly registered but fails to meet the procedural requirements.  It is the qualifications process where an individual *establishes* entitlement to that right; at the ballot-casting stage, the individual *exercises* it.  An athlete may be eligible to participate in a competition, but that does not confer immunity from penalties that follow from violating the rules of play.  Likewise, "[a] State's refusal to count the votes of these voters" who do not follow basic voting rules "does not constitute a denial of 'the right to vote.'" *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting).

**II.      Plaintiffs' Legal Theory Contravenes the Obvious Statutory Context.**

Plaintiffs' legal theory further errs in "confin[ing] itself to examining [the] particular statutory provision in isolation" without placing the provision "in context" and reading it to create "a symmetrical and coherent regulatory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) (citation omitted).

The Materiality Provision utilizes symmetry.  Its independent clause establishes the core prohibition: state actors may not "deny the right…to vote…because of an error or omission on any record or paper … relating to any application…."  Its follow-on dependent clause establishes a contingency limiting that prohibition: "if such error or omission is not material in determining whether such individual is qualified…to vote."  Without this dependent clause, the prohibition of the independent clause would apply without limitation.  Both sides of this grammatical equation speak to registration, forbidding disqualification for errors in the qualifications process that are irrelevant to qualifications.  Plaintiffs' read of the statute replaces this congruence with incongruence.  It expands the independent clause to reach any voting-related paper but maintains qualifications as the linchpin of the dependent clause.  The result is to forbid state actors from rejecting any voting-related paper (including a ballot) for any reason unrelated to qualifications.  Textually, this makes little sense, because it destroys the theme linking the independent and dependent clauses.  In practice, this disjunction elevates voter qualification to the sole criterion by which states may run their elections.

If Congress intended the independent clause to impact all voting-related laws, one would expect it to have afforded the dependent clause concomitantly broad reach, creating all-purpose federal standards for excusable and inexcusable voter error.  Some states employ such standards, including Pennsylvania.  Its precedent asks whether an error undermines "'weighty interests,'

like fraud prevention or ballot secrecy" that are "critical to the integrity of the election*." In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1073 (Pa. 2020) (plurality opinion).  Until clarified by the Pennsylvania courts last fall, there was an argument that underlying Pennsylvania law required undated ballots to be counted.  *See id*. at 1076–78 (finding failure to list date excusable); *Ritter v. Lehigh Cnty. Bd. of Elections*, 272 A.3d 989 (Table) (No. 1322 C.D. 2021, Jan. 3, 2022)(Pa. Commw. Ct.), *appeal denied*, 271 A.3d 1285 (Pa. 2022) (finding *In re Canvass* inapplicable under the "'false plurality' doctrine").  But the Pennsylvania courts resolved that issue against Plaintiffs, spurring them to return to federal court in an effort to countermand the Pennsylvania General Assembly and Pennsylvania Supreme Court.

The Materiality Provision could have drawn an all-purpose voter-error distinction, but it does not.  Instead, it identifies one interest—citizen qualifications—as legitimate and overrides state laws within its ambit. Logically, then, its ambit embraces registration laws, not all voting laws.

Furthermore, Plaintiffs fail to construe the Materiality Provision "in context." *Brown & Williamson*, 529 U.S. at 121.  The Provision belongs to a subsection addressing voter qualifications, not ballot casting and ballot counting.  The Materiality Provision was enacted as part of the 1964 Civil Rights Act, which added subsection (a)(2) to the Civil Rights Act of 1957. *See* Civil Rights Act of 1964, Pub. L. 88-352, §101, 78 Stat. 241 (1964).  That new subsection comprised parts (A), (B), and (C). *Id*. Part (B) is the Materiality Provision.  Parts (A) and (C) both pertain to voting qualifications.  Part (A) forbids differential standards "in determining whether any individual is qualified under State law or laws to vote." 52 U.S.C. § 10101(a)(2)(B). Part (C) forbids "any literacy test as a qualification for voting," with limited exceptions. *Id*. §

10101(a)(2)(C).  And the relevant portion of the heading is: "uniform standards for voting

qualifications." *Id*. § 10101(a).  It is erroneous to read Part (B)—with its parallel focus on

"whether [an] individual is qualified…to vote"—to govern much more than the qualifications

process.

The legislative history summarized this trifecta of qualifications-related provisions as

follows:

> the committee has amended the 1957 and 1960 Civil Rights Acts to provide
> that…State registration officials must: (1) apply standards, practices, and
> procedures equally among individuals seeking to register to vote; (2) disregard
> minor errors or omissions if they are not material in determining whether an
> individual is qualified to vote; (3) administer literacy tests in writing.

H.R. Rep. No. 88-914 (Nov. 20, 1963), 1964 U.S.C.C.A.N. 2391, 2491; see also Warren M.

Christopher, *The Constitutionality of the Voting Rights Act of 1965*, 18 Stan. L. Rev. 1, 7 (1965)

(describing the Materiality Provision as speaking to "registering individuals to vote in federal

elections" and forbidding rejections "because of immaterial omissions or errors in registration

forms").  One need not take any particular view on the relevance of legislative history to see that

this is a tidy and accurate description of the Materiality Provision in context. *Cf. Honeycutt v.*

*United States*, 137 S. Ct. 1626, 1635 (2017) (looking to legislative history that "confirms" the

meaning apparent on the face of a statute); *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293,

301 (2015) (same).

## III.    Plaintiffs' Legal Theory Contravenes Other Interpretive Canons.

Other interpretive canons foreclose Plaintiffs' Circuit's reading of the statute. To start,

"Congress … does not alter the fundamental details of a regulatory scheme in vague terms or

ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am.*

*Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  But the legal theory pressed by Plaintiffs would

transform the brisk, little known, and little used Materiality Provision into a newfound nuclear warhead targeting virtually all state ballot-casting requirements.

For decades, election-law challenges have turned on what "justifications for the burden imposed by" an election "rule" are sufficiently weighty to justify those burdens under the Fourteenth Amendment. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see also Burdick v. Takushi*, 504 U.S. 428 (1992). Applying the Fourteenth Amendment, this Court has directed federal judges to "weigh[] all [relevant] factors…to decide whether the challenged provision is unconstitutional," *id.*, and to test an election rule's relative burden against the relative weight of the state's interest, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008) (plurality opinion). Importantly, this *Anderson-Burdick* framework recognizes that interests beyond assessing "qualifications" may justify election rules. *See id.* at 189–90 (citation omitted).

Likewise, under the "results" test of the Voting Rights Act (VRA) § 2, codified at 52 U.S. Code § 10301, courts weigh "the policy underlying the state or political subdivision's use of" a challenged voting practice to ascertain whether it creates unequal electoral opportunity under the "totality of the circumstances." *Thornburg v. Gingles*, 478 U.S. 30, 37 (1986) (plurality opinion) (citation omitted). Because "every voting rule imposes a burden of some sort," "the strength of the state interests served by a challenged voting rule is … an important factor that must be taken into account" in assessing "whether a rule goes too far." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2339–40 (2021). Relevant justifications include more than voter qualifications: "A State indisputably has a compelling interest in preserving the integrity of its election process." *Id.* at 2347 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam)).

Little did anyone know that, in 1964, decades before Congress enacted the § 2 results test or the U.S. Supreme Court fashioned the *Anderson-Burdick* framework, Congress had denied

11

states any election-integrity interest to justify laws governing all election-related papers.  Under the Plaintiffs' legal theory, both *Anderson* and *Burdick* appear to have been wrongly analyzed. *See Anderson*, 460 U.S. at 782–83 (describing case as concerning omission as to voting-related papers); *Burdick*, 504 U.S. at 430–31 (similar).  Under Plaintiffs' paradigm, the Materiality Provision would supplant the *Anderson-Burdick* framework in a large class of election cases and call into question dozens of precedents passing on ballot rules.

Plaintiffs' theory also hands an unwitting victory to those advocating a more intrusive rendition of that doctrine and more expansive role of federal courts in setting election policy. *See, e.g.*, Armand Derfner & J. Gerald Hebert, *Voting Is Speech*, 34 Yale L. & Pol'y Rev. 471 (2016) (advocating that a First Amendment test supplant the *Anderson-Burdick* test).  To the contrary, the Supreme Court has forbidden federal courts from playing the role of state legislatures in setting election-administration rules and policy. *See, e.g.*, *Brnovich*, 141 S. Ct. at 2341–43; *Purcell*, 549 U.S. at 5. Surely, Congress did not reject that doctrine in the Materiality Provision without anyone being aware for over 50 years.

Furthermore, had the Materiality Provision covered ballot-casting laws, Congress would have had no reason to enact other provisions of the Voting Rights Act of 1965 or the Help America Vote Act of 2002 that expressly protect ballots cast by qualified voters. *See, e.g.*, 52 U.S.C. § 10307(a) ("No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote … or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote."); 52 U.S.C. § 21081(a)(6) ("Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State.").

Additionally, Plaintiffs' theory, if accepted, would mean that most every election recount has been wrongly litigated and decided.  Recounts and contests ordinarily turn on whether contested ballots comply with ballot-casting rules.  Plaintiffs would preempt all of these determinations—turning them over to federal courts to decide the outcomes of all close elections on an *ex post* determination of whether the ballot-casting rules' requirements are material.

For example, at issue in the notable 2008 Minnesota senate recount were "ten categories of rejected absentee ballots that would not be considered legally cast as a matter of law because the ballots failed to comply with one or more of the statutory requirements for voting by absentee ballot." *In re Contest of Gen. Election Held on Nov. 4, 2008, for Purpose of Electing a U.S. Senator from State of Minnesota*, 767 N.W.2d 453, 458 (Minn. 2009).  The losing candidate argued that the federal Due Process Clause imposed a standard of "substantial compliance," rather than "strict compliance," but the Minnesota Supreme Court held that federal law does not supplant such quotidian rules, including that "[t]he voter mark[] the ballot before a witness and put[] the ballot in the secrecy envelope," "[t]he voter then put[] the secrecy envelope…in the ballot return envelope," "[t]he voter and the witness each sign the ballot return envelope," "[t]he completed ballot return envelope [be] returned to the county auditor or municipal clerk," and so forth. *In re Contest of Gen. Election Held on Nov. 4, 2008*, 767 N.W.2d at 460–61.  According to Plaintiffs' legal theory, the Materiality Provision preempted these rules.

But the Minnesota Supreme Court broke no new federal-law ground.  Rather, it followed a venerable line of cases holding that "federal courts do not involve themselves in '"garden variety" election disputes' and only intervene if 'the election process itself reaches the point of patent and fundamental unfairness.'" *Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 580 (11th Cir. 1995) (collecting cases); *accord Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir.), *as*

13

*amended on denial of reh'g* (June 23, 1998) (collecting more cases).  According to Plaintiffs, the Materiality Provision all along mandated federal-court intervention in garden-variety election disputes.  Who knew?  "The fact that no such argument was even made" in those cases "illuminates the profession's understanding of the scope of" the Materiality Provision. *United States v. Ross*, 456 U.S. 798, 819 (1982).

Indeed, Plaintiffs' theory would signal that the 2000 presidential recount culminating in *Bush v. Gore*, 531 U.S. 98 (2000), was litigated on the wrong foundation.  The case began as a recount under Florida law, which required a single vote per contest and disqualified ballots that either registered no vote (an "undervote") or many (an "overvote"). *See Gore v. Harris*, 772 So. 2d 1243, 1264 n.26 (Fla. 2000) (Well, C.J., dissenting) (describing the regime).  The dispute centered on how to ferret out those incorrectly identified as undervotes and overvotes and properly count them. *Bush*, 531 U.S. at 107–08. Only after Florida officials struggled to do so, *see id*. at 111, did the U.S. Supreme Court determine that a federal issue was presented under the Equal Protection Clause and that the recount failed under "the rudimentary requirements of equal treatment and fundamental fairness." *Id*. at 109.

But under Plaintiffs' view, the premise of the dispute was wrong.  Rather than litigate overvotes and undervotes, and then the state-law process for distinguishing them, the Materiality Provision likely would have invalidated the entire ballot-counting regime.  An overvote would be an "error," an undervote an "omission," and the ballot a "paper." 52 U.S.C. §10101(a)(2)(B). Because the one-vote requirement is not material to "age, citizenship, residency, or current imprisonment for a felony," it would be preempted.  According to Plaintiffs, the entire Florida recount was conducted and litigated, in multiple courts and by dozens of experienced lawyers, under the wrong federal law.  The legal theory is such a sweeping and radical departure from

decades of jurisprudence that the U.S. Supreme Court vacated the only decision to veer down this path in the nearly sixty years since the law was enacted.

Moreover, the legal theory is so unorthodox that it "would produce an absurd and unjust result which Congress could not have intended." *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (citation omitted). This is so in several respects.  First, there is no reason to believe Congress did not recognize a state's "indisputably…compelling interest in preserving the integrity of its election process." *Purcell*, 549 U.S. at 4 (citation omitted).  In the absence of contrary textual indicia, it is improper to read the Materiality Provision to negate that interest as to every election rule that does not "help[] determine" a voter's "age, citizenship, residency, or current imprisonment for a felony."

One cannot overstate the breadth and depth of disruption that such an expansive application of the Materiality Provision would introduce.  Pennsylvania, like all jurisdictions, regulates ballot-casting for purposes other than ascertaining voter qualifications, and it could hardly do otherwise.  Pennsylvania law directs absentee voters "to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen"; "fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed 'Official Election Ballot'"; place that envelope in a "second" envelope, "on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector"; "fill out, date and sign the declaration printed on such envelope"; and ensure the envelope is "securely sealed" and sent "by mail, postage prepaid, except where franked, or deliver it in person to said county board of election." 25 Pa. Stat. §3150.16(a).

It imposes these requirements for compelling reasons.  It is essential that voters create markings that machines can read to avoid hand counting an untold number of ballots.  It is prudent that envelopes bear the label "Official Election Ballot" to provide notice that malfeasance may result in prosecution.  Using two envelopes to separate the voter's information from the voter's vote protects the secret ballot.  And other commands of this statute (e.g., secure sealing and folding) facilitate mail transmission. Not one of these requirements bears on a voter's qualifications.

Significantly, none of these ballot-casting rules would survive the Plaintiffs' read of the Materiality Provision despite the fact that each serves a compelling state interest. *See Storer v. Brown*, 415 U.S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.").  Congress surely did not intend to preempt all these rules—and an untold number of others.

To be sure, Pennsylvania law may excuse some failures to comply with some of these dictates, but surely not all of them. *See In re Canvass*, 241 A.3d at 1072 (surveying different results as to different requirements).  As explained, the Materiality Provision is not a surgeon's scalpel, finitely differentiating material from immaterial errors based on a state's "weighty interest[s]." *Id*.  It is a blunt sledgehammer recognizing only one interest and excluding all others.  Reading it to reach all election-related papers would invalidate any election rule irrelevant to qualifications, no matter its justification.  That is not only absurd but "silly." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting).

Second, Congress also could not have intended to preempt such rules without enacting substitutes.  It is hard enough to believe Congress intended to preempt Pennsylvania's

requirements concerning writing utensils, envelope stuffing, and the like, but it is impossible to believe Congress did so without enacting replacement standards.

Take the *Bush v. Gore* fact pattern.  The Third Circuit's theory, relied upon by Plaintiffs, would surely require that overvotes and undervotes be counted, preempting Florida's contrary law.  But the question was not merely *whether* to count them but *how*.  Where a ballot shows markings by two or more candidates, or none, it is a mystery where the vote should go in the count. The Plaintiffs' theory would command that these ballots be counted but provide no guidance on how to tally them, leaving election officials, courts, candidates, the nation, and the world in *Bush v. Gore* with a momentous contest and no rules to resolve it.

Third, the new theory would lead to erratic results, invalidating some rules but leaving similar rules in place for no obvious or rational reason.  By eliminating one significant gateway to the Materiality Provision's coverage—that a voting paper relate to a registration, application, or something else of *that* genre—the new theory would leave the statutory heavy lifting to the other gateway requirement—that there be a "record or paper."

The result is that a state would be permitted much greater latitude to regulate aspects of elections that do not involve a "record or paper."  For example, if the Materiality Provision were applied to eliminate a dating requirement for absentee ballots, it would not prevent election officials from asking voters who appear in person to identify the date and disqualifying them for incorrect answers.  Likewise, a signature requirement for absentee votes would be vulnerable, but an in-person voter identification requirement may well survive because non-compliance seems not to be "an error or omission on a[] record or paper." 52 U.S.C. § 10301(a)(2)(B). These and other differential results would have no apparent basis in the right to vote or a state's legitimate bases for regulating elections.

The point here is not that some of these types of requirements, like voter identification, should be invalidated.  Far from it. *See Crawford*, 553 U.S. at 203–04 (upholding voter identification rule from constitutional challenge).  The point rather is that, if Congress were to enter the field of preempting some voting laws but not others, one would expect it to employ some intelligent and rational basis for distinguishing burdens and justifications that are, respectively, too onerous and too tenuous.  The Plaintiffs' theory, by contrast, takes some voting rules away and leaves others behind in a manner that appears hardly better than striking marks in elections codes, blindfolded, based on whether paper is involved in the challenged procedure.

Yet another problem with Plaintiffs' overbroad read of the statute is that it places the Materiality Provision into constitutional doubt, at least as applied to non-federal elections. *See, e.g.*, *Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) (plurality opinion). The Materiality Provision originally applied only to "any Federal election," Civil Rights Act of 1964, Pub. L. 88–352, §101(a)(2), 78 Stat. 241 (1964), under Congress's authority to regulate the "time, place, or manner" of federal elections, H.R. Rep. No. 88-914 (Nov. 20, 1963), 1964 U.S.C.C.A.N. 2391, 2492 (citing U.S. Const., art. I, § 4).  However, in 1965, Congress elected to "[d]elete the word 'Federal' wherever it appears in subsections (a) and (c)" of this U.S. Code section, Voting Rights Act of 1965, Pub. L. 89–110, §15(a), 79 Stat. 437, 445 (1965), relying on its Fourteenth and Fifteenth Amendment authority, *see* H.R. Rep. No. 89-439, (June 1, 1965), 1965 U.S.C.C.A.N. 2437, 2437, 2464–65.

Plaintiffs would expand the Materiality Provision well beyond that latter authority. "Legislation which alters the meaning of" the Civil War Amendments "cannot be said to be enforcing" them. *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997).  Because the Supreme Court has held that the Fourteenth Amendment permits "evenhanded restrictions that protect the

integrity and reliability of the electoral process itself," beyond voting "qualifications," *Crawford*, 553 U.S. at 189–90, Congress lacks authority to forbid any voting-paper-related regulations of non-federal elections unrelated to qualifications.  There is no "proportionality or congruence" between any alleged voting-related burden and a total ban on election-integrity and -reliability interests in voting laws. *City of Boerne*, 52 U.S. at 533.

Nor can this reading of the Materiality Provision rest on the Fifteenth Amendment's guarantee of racial equality in voting, since "discriminatory intent [must] be prove[n]" to establish a violation of this Amendment, *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion), and the Materiality Provision requires no "proof of deliberate or overt discrimination," *City of Boerne*, 521 U.S. at 517. The statute is not "a proper exercise of Congress' remedial or preventive power." *Id*. at 529.  There is no record evidence establishing that "generally applicable laws passed" to achieve basic election administrability and integrity were actually passed "because of…bigotry." *Id*. at 530.  Congress had evidence that election officials in the Jim Crow South engaged in "racial discrimination against Negro applicants for voter registration," "including the rejection of applicants for inconsequential errors on the application form." S. Rep. No. 89-162, (April 20–21, 1965), 1965 U.S.C.C.A.N. 2508, 2546. Construing the Materiality Provision to reach registration-related papers affords it a reach congruent and proportional to that problem.  That reading may also be congruent and proportional to enforcing the right to vote against unreasonable burdens.  But reading the statute expansively to also reach all voting-related papers, ballots included, raises considerable constitutional questions. Where the former reading is better in all events, the avoidance canon commands that it be adopted. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 576–77 (1988).

**IV.     Plaintiffs' Legal Theory Jeopardizes All Pennsylvania Mail-In Voting.**

If the profound error of the Third Circuit's ruling in *Migliori*, and the absurd results that would follow, were not sufficient reasons for vacatur by the Supreme Court, the threat the decision posed to Pennsylvania's mail-in voting system surely would have sufficed.  By invaliding one provision of a non-severable mail-in voting law, the Plaintiffs' legal theory, if adopted by this Court, would likely abolish mail-in voting in Pennsylvania.

At issue in this case is the requirement of the Pennsylvania Election Code that voters "date and sign the declaration" accompanying a mail-in vote. 25 Pa. Stat. § 3150.16(a).  This provision was enacted as section 8 of Act 77, a sweeping legislative package that established universal mail-in voting in Pennsylvania.  This historic "liberalization of mail-in voting" drew bi-partisan support. *Republican Party of Pennsylvania v. Boockvar*, 141 S. Ct. 1, 1 (2020) (statement of Alito, J.).  But part of the compromise was codified in section 11, which provides "that 'Sections 1, 2, 3, 3.2, 4, 5, 5.1, 6, 7, 8, 9 and 12 of this act are non-severable. If any provision of this act or its application to any person or circumstance is held invalid, the remaining provisions or applications of this act are void.'" *McLinko v. Dep't of State*, 279 A.3d 539, 550 (Pa. 2022) (internal citations omitted).

It appears inescapable that the Plaintiffs are requesting this federal court to invalidate a provision of section 8, which would trigger the non-severability provision and dismantle Pennsylvania's entire mail-in voting system.  Indeed, following the Third Circuit's ruling in *Migliori*, a new lawsuit was filed and remains pending to enforce the non-severability provision. *See* Compl., *Bonner v. Chapman*, 364 M.D. 2022 (Pa. Commw. Ct. 2022).  And the Pennsylvania courts—heretofore faithful to the General Assembly's policy choices—are well aware of the problem. *See, McLinko*, 279 A.3d at 609–10 (Brobson, J., dissenting) (observing

20

this open non-severability problem); *McLinko*, 270 A.3d at 1277–78 (Wojcik, J., concurring and dissenting).

 If this Court follows Plaintiffs' unconventional legal theory, it will likely trigger the non-severability provision and result in the invalidation of Act 77's expansion of no-excuse mail-in voting.  That outcome is avoidable and should be avoided.

## **CONCLUSION**

This Court should reject the Plaintiffs' erroneous legal theory and grant the motion for summary judgment against the Plaintiffs.

Respectfully submitted,

_____/s/ Linda A. Kerns_____
Linda A. Kerns, Esquire
Law Offices of Linda A. Kerns, LLC
1420 Locust Street, Suite 200
Philadelphia, PA 19102
PA 84495
linda@lindakernslaw.com
215-731-1400 (T)
215-701-4154 (F)
*Counsel for Lawyers Democracy Fund*

May 10, 2023