**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BETTE EAKIN, et al, | ) | |
| | ) | |
|     Plaintiffs | ) | |
| | ) | |
| vs. | ) | C.A.No. 1:22-CV-340 |
| | ) | |
| ADAMS COUNTY BOARD OF | ) | |
| ELECTIONS, et al, | ) | ECF Nos. 280, 281, 286, 287, 377 |
| | ) | |
|     Defendants. | ) | |

**MEMORANDUM OPINION**

### I. Introduction

This case directly implicates the right of citizens of the Commonwealth of Pennsylvania to cast a vote. The Court of Appeals for the Third Circuit has delineated the strong, foundational undercurrents associated with laws and regulations which may burden that right:

> Nowhere are the First Amendment rights of free speech and association more essential, or more fiercely guarded, than in the context of free and open elections. Self-government depends on ensuring that speech intended to support, challenge, criticize, or celebrate political candidates remains unrestricted. But at the end of every hard-fought political campaign lies the ballot box, where our constitutional democracy depends equally on States fulfilling their solemn duty to regulate elections to ensure fairness and honesty, even where doing so may burden some First Amendment rights.

*Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 131 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023).

Presently before the Court is another legal challenge to the "vote by mail" practices established by the Commonwealth of Pennsylvania in 2019. Ms. Bette Eakin is a registered voter who resided in Erie County, Pennsylvania at all times relevant to this litigation, including during the 2022 General Election. *See* ECF No. 228, ¶ 12. She is the lone individual Plaintiff in this

case. The other Plaintiffs are organizations with varied interests in voting and elections. The Democratic Senate Campaign Committee ("DSCC") is the Democratic Party's national senatorial committee. Its mission is to elect candidates of the Democratic Party across the country, including in Pennsylvania, to the United States Senate. *Id*. at ¶ 13. Similarly, the Democratic Congressional Campaign Committee ("DCCC") is that Party's national congressional committee. Its mission is to elect candidates of the Democratic Party to the United States House of Representatives. *Id*. at ¶ 14. AFT Pennsylvania (the "Federation") is the Pennsylvania affiliate of the American Federation of Teachers and is a union of professionals representing over twenty-five thousand members in 55 local affiliates across Pennsylvania, including 179 members across two affiliates in Erie County. *Id*. at ¶ 15.

Named as Defendants are the Commonwealth's sixty-seven county boards of elections.[1] Plaintiffs challenge the manner in which the county boards enforce certain provisions of state law which concern the rejection of incorrectly dated and undated mail ballots, particularly as was done during the 2022 General Election. No department or administrative body representing the Commonwealth has been sued. Several organizations associated with the Republican Party have intervened as Defendants. These include: the Republican National Committee ("RNC"), the National Republican Congressional Committee ("NRCC"), and the Republican Party of Pennsylvania ("RPP").

The Amended Complaint challenges a Pennsylvania law that requires a voter using a mail ballot to indicate a date on the outer return envelope. *See* 25 Pa. Cons. Stat. §§ 3146.6(a),

---

[1] According to Plaintiffs, each county board has jurisdiction over the conduct and management of primaries and general elections in their respective counties in accordance with provisions of state law. In this capacity, the county boards are charged with accepting applications for mail ballots, mailing the ballots to the requesting voter, as well as receiving, canvassing, and counting the returned mail ballots. ECF No. 228, ¶ 16.

3150.16(a). Plaintiffs argue that the date requirement violates the "Materiality Provision" of the Civil Rights Act (Count I), 52 U.S.C. §10101, and their right to vote as guaranteed by the First and Fourteenth Amendments to the Constitution. *See* ECF No. 228, pp. 14-18. Plaintiffs seek declaratory and injunctive relief as well as litigation costs. *Id.,* p. 19. Specifically, Plaintiffs request: a declaration that the "Date Instruction, as it appears in 25 P.S. § 3146.6(a) and 25 P.S. § 3150.16(a), and any other provision that requires counties to reject ballots contained in envelopes that do not contain a correct date violates … the First and Fourteenth Amendment to the U.S. Constitution," as well as a permanent injunction "enjoining Defendants … and all persons acting in concert with each or any of them, from rejecting or refusing to count absentee and mail-in ballots for failure to comply with the Date Instruction." *Id.*

The Lancaster County Board of Elections has moved for summary judgment as has the Board of Elections from Berks County. ECF Nos. 280, 286. The RNC has also moved for summary judgment. ECF Nos. 281, 377. Plaintiffs have cross-moved for summary judgment. ECF No. 287. The motions have been fully briefed and are ripe for disposition.[2] Before turning to the merits of those motions, the standards which guide the Court's decision on the pending motions for summary judgment will be set out.

## II.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[2] By Order dated May 16, 2024, the parties were granted  leave to supplement their prior motions for summary judgment following lifting of a stay that was put in place during the pendency of an appeal in the companion case of *NAACP v. Chapman*, C.A. No. 1:22-cv-339. *See* ECF No. 375.

entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). When deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) *citing Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) ("[T]he nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find

for him at trial."). If the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co*., 972 F.2d 53, 55, n.5 (3d Cir. 1992) *quoting Celotex*, 477 U.S. at 322-23. In *Moore v. Walton*, 96 F.4th 616 (3d Cir. 2024), the Court of Appeals for the Third Circuit recently explained: "A genuine dispute exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit under the governing law." *Id*. at 622 (internal punctuation and citations omitted). *See also Tatel v. Mt. Lebanon Sch. Dist.*, 2024 WL 4362459, at *19–20 (W.D. Pa. Sept. 30, 2024); *Zurn Inds., LLC v. Allstate Ins. Co*., 2024 WL 4350271, at *1 (W.D. Pa. Sept. 30, 2024).

## III.  Discussion

### A.    Background

The Commonwealth of Pennsylvania's Election Code permits voters to cast their ballots by mail. In completing such ballots, voters must "date and sign the declaration" on the outer return envelope.[3] ECF No. 228, ⁋ 19. *See also* 25 P.S. § 3150.16(a). Under current practice, if the

---

[3] The mail ballot package consists of the ballot itself, instructions, a "Secrecy Envelope," and a larger pre-addressed outer "Return Envelope" on which a voter declaration form is printed. The Election Code provides that the inner Secrecy Envelope be marked only with the words "Official Election Ballot." 25 P.S. § 3146.4. The larger outer Return Envelope is to contain "the form of declaration of the elector, and the name and address of the county board of election of the proper county." *Id*.

date on the outer envelope is incorrect or missing, the ballot is not counted. It is undisputed that in the 2022 general election, over 10,000 mail ballots were disqualified for this reason. ECF No. 311, ⁋ 10; ECF No. 313, ⁋ 10.

In challenging the requirement that a voter date the outer return envelope, Plaintiffs bring two claims: first, they contend that requiring voters to date the outer envelope violates the Materiality Provision of the Civil Rights Act (Count I). And second, Plaintiffs assert that the county boards' enforcement of the dating provisions violates their rights under the First and Fourteenth Amendments by impermissibly burdening the fundamental right to vote (Count II). *See* ECF No. 228. [4]

---

[4]  The Lancaster County Board, joined by the Berks County Board, raises a justiciability concern, that while important, is resolved without difficulty. The Boards argue that these Plaintiffs lack standing to pursue their claims <u>against</u> <u>them</u> because none of Plaintiffs' injuries were caused <u>by</u> <u>them</u> or resulted from any action <u>they</u> took. ECF No. 280 (Lancaster County), page 3; ECF No. 286 (Berks County).

Of course, standing is necessary for subject matter jurisdiction (*see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014)), and part of the standing inquiry is whether a plaintiff has shown that it has an injury that is fairly traceable to the defendant's conduct. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[S]tanding to sue each defendant … requires a showing that each defendant caused [the plaintiff's] injury…" *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) *citing Lujan*, 504 U.S. at 560-61. The evidence of record demonstrates that the AFT, DCCC, and DSCC each have standing against the Berks and Lancaster Boards.

These Plaintiff organizations claim direct or organizational standing. An entity has direct organizational standing when it suffers harm due to the defendant's allegedly unlawful conduct, particularly when it must divert resources to address the issue. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). For example, standing exists when the defendant's actions significantly impair the organization's ability to provide services, forcing it to expend substantial resources to counteract the harm. *See id.*; *Fair Hous. Rts. Ctr. in Se. Pa. v. Post Goldtex GP, LLC*, 823 F.3d 209, 214 n.5 (3d Cir. 2016) (finding standing where an organization's mission was frustrated because it had to allocate resources to investigate and challenge the alleged misconduct). The actions of the Berks and Lancaster Boards, along with all sixty-five other boards of elections, hindered the AFT, DCCC, and DSCC from fulfilling their respective missions. *See* ECF No. 290 (Exhibit D, Declaration of Arthur Steinberg, President of AFT Pennsylvania), pages 18-19, at ⁋⁋ 5-7; ECF No. 290 (Exhibit C, Declaration of Erik Ruselowski,

_____

Chief Operating Officer of DCCC), pages 13-14, at ¶¶ 2-5; ECF No. 290 (Exhibit B, Declaration of Devan Barber, Senior Advisor of DSCC), pages 8-9, at ¶¶ 2-5. The evidence reflects that the county boards' enforcement of the Date Provision compels each Plaintiff organization to redirect resources from other initiatives in Pennsylvania and other states to voter education and assistance efforts aimed at preventing disenfranchisement or curing misdated and undated ballots in Pennsylvania. *See* ECF No. 290, pages 19-20, at ¶¶ 10-11 (AFT); ECF No. 290, pages 14-16, at ¶¶ 6-10 (DCCC); and ECF No. 290, pages 9-11, at ¶¶ 6-12 (DSCC).

All three Plaintiff organizations also claim associational or representative standing because they satisfy the three requirements for such: each organization's members have standing in their own right, the interests the organization seeks to protect in the lawsuit are germane to the organization's purpose, and the individual members' participation in the lawsuit is unnecessary to resolve the legal claims. *See Pennsylvania Psychiatric Soc. v. Green Spring Health Services, Inc.,* 280 F.3d 278, 283 (3d Cir. 2002) *quoting Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Examining the three requirements in reverse order, resolution of the constitutional claims in this case does not depend on, nor would it benefit from, the participation of the individual AFT members or the individual DCCC and DSCC constituents. Next, the record evidence demonstrates that the interests sought to be protected in this lawsuit, the enfranchisement of their voters, are highly germane to the DCCC's and DSCC's purposes of electing Democratic candidates to both houses of Congress. ECF No. 290 (Exhibit C-DCCC), page 13, ¶ 3; ECF No. 290 (Exhibit B-DSCC), page 8, ¶ 3. And the AFT's interest of electing candidates who support the policies for which AFT advocates is also germane to the enfranchisement of its members. ECF No. 290 (Exhibit D-AFT Declaration), ¶ 11. Finally, the evidence reveals that the dues-paying members of the AFT, would have standing in their own right because they will have or have had mail ballots rejected due to the enforcement of the Date Provision. ECF No. 290 (Exhibit D-AFT Declaration), ¶ 9. However, the same cannot be said of the DCCC and the DSCC as no evidence has been presented to show that the constituents of either organization have had their mail ballots rejected. Instead, the evidence set forth by the committees focuses only on diversion of resources rather than on disenfranchisement of individual constituents.

Accordingly, in summary, all three Plaintiff organizations have organizational standing and the AFT has representative standing on behalf of its members.

While the Plaintiff organizations have established standing to proceed against each of the sixty-seven county boards, the same cannot be said for Eakin. The record contains no evidence to support her standing against the Lancaster or Berks County Boards—or any other board aside from her own. Any harm she experienced due to the initial rejection of her 2022 mail ballot is directly linked only to the actions of the Erie County Board of Elections. ECF No. 290 (Exhibit A, Declaration of Bette Eakin), pages 4-6. As a result, summary judgment will be granted in favor of the Lancaster and Berks Boards in this regard.  Furthermore, because Eakin has not demonstrated standing against any county board other than Erie County, judgment will be entered in favor of those sixty-four boards and against her.

The first claim—whether the outer envelope date requirement violates the Materiality Provision of the Civil Rights Act—has been decided. An identical claim has already been litigated before this Court in *Pennsylvania State Conf. of NAACP v. Schmidt ("NAACP v. Schmidt")*, 703 F. Supp. 3d 632, 645 (W.D. Pa. 2023), *rev'd and remanded sub nom. Pennsylvania State Conf. of NAACP Branches v. Sec'y Commonwealth of Pennsylvania*, 97 F.4th 120 (3d Cir. 2024). On appeal from this Court's decision, on March 27, 2024, the Court of Appeals held that the date requirement did not violate the Materiality Provision. *See* 97 F.4th 120. This Court is bound by that holding regarding the Materiality Provision of the Civil Rights Act.[5] Accordingly, Plaintiffs' similar claim here lacks merit and judgment will be granted in favor of Defendants on that claim.

The Court of Appeals' decision in that case did not, however, resolve the constitutional claim alleged herein. Specifically, Plaintiffs maintain that the county boards' enforcement of the dating provisions violates the First Amendment by imposing impermissible burdens on Pennsylvanians' fundamental right to vote—burdens that are not justified by any state interest.

## B.  First Amendment Right to Vote Claims and the Appropriate Legal Tests

Elections and, concomitantly, election laws "occupy a special place in our constitutional system." *Mazo,* 54 F.4th at 136. States have the authority under the Constitution to set rules for the time, place, and manner of federal elections. U.S. Const. Art. I, § 4, cl. 1; Art. II, § 1, cl. 2. Given this, the individual states have historically maintained "comprehensive, and in many respects complex, election codes regulating ... the time, place, and manner of holding primary and general elections." *Storer v. Brown*, 415 U.S. 724, 730 (1974). This authority over federal

---

[5] A petition for Writ of Certiorari was denied by the United States Supreme Court. *See* 2025 WL 247452 (Jan. 21, 2025).

elections is broad and encompasses "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). This authority is expansive because, if elections "are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process," (*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358  (1997)), it is "[c]ommon sense, as well as constitutional law," that States must take an "active role in structuring elections." *Mazo v. Way*, 551 F.Supp.3d 478, 500 (D.N.J. 2021) (cleaned up). Since individual states "comprehensively regulate the electoral process," their election laws "inevitably affect[, ] at least to some degree[, ]" certain fundamental rights, including the right to vote and First Amendment rights of free expression and association. *Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64, 70 (3d Cir. 1999).

To assess whether restrictions or regulations related to voting rights are constitutionally valid, courts must utilize one of two possible tests. In some cases, a traditional First Amendment test which applies strict scrutiny to any such regulation is used. But that test does not take into account the reality that "for elections to run smoothly, some restrictions on expression and association are necessary." *Mazo*, 54 F.4th at 137. In recognition of that omission, the Supreme Court developed a balancing test for courts to use when reviewing "[c]onstitutional challenges to specific provisions of a state's election laws." *Anderson v. Celebrezze,* 460 U.S. 780, 789 (1983). *See also Burdick v. Takushi*, 504 U.S. 428, 433 (1992). This "*Anderson-Burdick*" test is "more flexible" than the rigid tiers of scrutiny under a traditional First Amendment analysis, *Burdick*, 504 U.S. at 434, reflecting the reality that there is no " 'litmus-paper test' that will separate valid from invalid restrictions," *Anderson*, 460 U.S. at 789. The test directs a reviewing court to (1) determine the "character and magnitude" of the burden that the challenged law imposes on

constitutional rights, and (2) apply the level of scrutiny corresponding to that burden. *Burdick*, 504 U.S. at 434, *quoting Anderson*, 460 U.S. at 789. If the burden is "severe," the court must apply exacting scrutiny and decide if the law is "narrowly tailored and advance[s] a compelling state interest." *Timmons*, 520 U.S. at 358. But if the law imposes only "reasonable, nondiscriminatory restrictions," *Anderson*, 460 U.S. at 788, the court may use *Anderson-Burdick's* sliding scale approach under which a state need only show that its "legitimate interests ... are sufficient to outweigh the limited burden," *Burdick*, 504 U.S. at 440. *See also Mazo*, 54 F.4th at 137. No matter the test utilized, some sort of balancing is always required.

Courts have applied *Anderson-Burdick* to a wide range of state election laws covering nearly every aspect of the electoral process. *See, e.g., Belitskus v. Pizzingrilli*, 343 F.3d 632, 643-47 (3d Cir. 2003) (applying *Anderson-Burdick* in challenge to Pennsylvania ballot access law requiring candidates to pay filing fee to have their names placed on the general election ballot); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626-36 (6th Cir. 2016) (applying *Anderson-Burdick* to a challenge to Ohio law that changed the first day of early absentee voting from 35 days before election day to the day after the close of voter registration). In other cases, however, the Supreme Court has declined to apply *Anderson-Burdick's* balancing test and has reverted instead to a traditional First Amendment analysis. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (rejecting application of *Anderson-Burdick* in challenge to ban on anonymous leafletting of political materials as it constituted the "regulation of pure speech"); *Meyer v. Grant*, 486 U.S. 414, 420 (1988) (declining to apply *Anderson-Burdick* to free expression challenge to ban on paying petition circulators for ballot initiatives). The Supreme Court has never laid out a clear rule to distinguish between these two categories of election laws,

nor has any Court of Appeals to our knowledge.  So, to decide the category in which the outer envelope date requirement falls, the Court must first identify its defining characteristics.

A survey of the Supreme Court's case law both before and after the *Anderson* and *Burdick* decisions reveals two principal characteristics of the laws to which the *Anderson-Burdick* test applies. First, the law must burden a relevant constitutional right, such as the right to vote or the First Amendment rights of free expression and association. Second, the law must primarily regulate the mechanics of the electoral process, as opposed to core political speech.

        1.      Does the Pennsylvania date requirement burden a fundamental right?

Plaintiffs ground their claim in the First Amendment to the Constitution. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." The United States Supreme Court has held that "the right to vote, as the citizen's link to h[er] laws and government, is protective of all fundamental rights and privileges. And before that right can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny." *Evans v. Cornman*, 398 U.S. 419, 422 (1970). *See also Jones v. United States Postal Serv.*, 488 F. Supp. 3d 103, 138 (S.D.N.Y. 2020), *order clarified*, 2020 WL 6554904 (S.D.N.Y. Sept. 29, 2020). It is well established that voting implicates First Amendment rights. *See, e.g., Yang v. Kosinski*, 960 F.3d 119, 130 (2d Cir. 2020) ("[Plaintiffs'] interest ... 'to cast their vote effectively' falls squarely within the ambit of the protection offered by the First Amendment."). And the right to vote necessarily includes the right to have that vote counted. This principle has been affirmed by the  Supreme Court. *See e.g., Reynolds v. Sims*, 377 U.S. 533 (1964) (finding that the right to vote would be meaningless without ensuring that every legally cast vote is counted). Disenfranchising voters for defects in their ballots imposes significant burdens on voting rights even if the effort needed for a voter to complete the ballot

correctly appears slight when considered in isolation. *See Ne. Ohio Coal. for the Homeless*, 837

F.3d at 631 ("Requiring boards of elections to reject the ballots of absentee and provisional

voters who fail to accurately complete birthdate and address fields directly and measurably

disenfranchise some voters."). The first part of the test is met because the Pennsylvania date

requirement similarly burdens the fundamental right to vote by disenfranchising some voters for

defects in the envelope holding their ballots.

> 2.    Does Pennsylvania's outer envelope date requirement primarily regulate the mechanics of the electoral process, as opposed to core political speech?

The second inquiry asks whether Pennsylvania's requirement that a voter place a date on

the outer envelope of their ballot is a law primarily concerned with the mechanics of the electoral

process, or whether it implicates core political speech. As the Court of Appeals noted, "[t]he

distinction between 'pure speech' and the mechanics of the electoral process is not always easy

to ascertain." *Mazo*, 54 F.4th at 142. In resolving such questions, there are "two distinguishing

factors" to be considered: "the location and timing (the 'where and when') and the nature and

character ('the how and what') of the regulated speech." *Id*.

> a.    Location and Timing of the Regulated Speech

Speech which occurs "on the ballot or within the voting process will typically trigger

application of the *Anderson-Burdick* balancing test." *Id*., *citing Burdick*, 504 U.S. at 437-38.  In

contrast, "speech that relates to an election but occurs nowhere near the ballot or any other

electoral mechanism is treated as core political speech entitled to the fullest First Amendment

protection." *Id. citing McIntyre*, 514 U.S. at 347 (applying strict scrutiny where the speech being

regulated was leafletting that occurred far from the polling place and potentially weeks or

months before Election Day). Here, the requirement that voters date the outer envelope of their ballot is speech that occurs within the voting process, as opposed to core political speech.

b.        Nature and Character of the Regulated Speech

Next, the Court must consider the nature and character of the regulated speech. Here, the Court considers "what is being said and how it is communicated." *Mazo*, 54 F.4th at 142. The Supreme Court has characterized "core political speech" as "interactive communication concerning political change." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186 (1999) (citation omitted). *Anderson-Burdick* balancing is not applied to regulations which burden such interactive communication between individuals. *Meyer*, 486 U.S. at 421-22.  Of import, such a regulation must have the potential to "spark direct interaction and conversation." *Mazo*, 54 F. 4th at 143. Here, there is no evidence to suggest that the placing of a date on the outer envelope of a mail ballot sparks interaction or political conversation with other individuals. Indeed, no litigant has suggested that the signing and dating of a mail ballot by a Pennsylvania voter is anything other than a solitary act. It is not a social occasion. It cannot be said that handwriting a date on the outer ballot envelope is core political speech. The regulation affects only the mechanics of voting.

So then, because the date requirement burdens the fundament right to vote but concerns only the mechanics of voting, the Court will utilize *Anderson-Burdick's* balancing test to determine whether the date requirement passes constitutional muster.

C.    **Application of the *Anderson-Burdick* Test – Defendants' motion for summary judgment[6]**

Having determined that the *Anderson-Burdick* test is the appropriate analytical

framework for reviewing Plaintiffs' constitutional challenge, the Court now applies that standard

to Pennsylvania's ballot date requirement. *Anderson-Burdick* involves a "two track approach."

*Mazo*, 54 F.4th at 145, *citing Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 205 (2008)

(Scalia, J., concurring). "[O]ur scrutiny is a weighing process: We consider what burden is

placed on the rights which plaintiffs seek to assert and then we balance that burden against the

precise interests identified by the state and the extent to which these interests require that

plaintiff's rights be burdened." *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006); *see also*

*Burdick*, 504 U.S. at 434 ("Under this standard, the rigorousness of our inquiry into the propriety

---

[6] Alternative to the application of the constitutional framework, the RNC submits that recent decisions by state courts preclude any action from this Court. *See* ECF No. 411, p. 2. This Court disagrees. The RNC points to the recent litigation in *Black Pol. Empowerment Project v. Schmidt*, as a reason for this Court to refrain from issuing a decision.  *Id.*  In that case, the Pennsylvania Commonwealth Court held that enforcement of the state's requirement that voters date the outer envelope of their mail ballot violates the Free and Equal Elections clause of the Pennsylvania Constitution. *See* 2024 WL 4002321, at *1 (Pa. Commw. Ct. Aug. 30, 2024); PA. CONST. art. I, § 5. The decision of the Commonwealth Court concerned the state constitution's "Free and Fair Elections" clause; not the federal constitution. Two weeks later, in a one paragraph Order, the Supreme Court of Pennsylvania vacated that decision, concluding that the Commonwealth Court lacked original jurisdiction because Plaintiffs failed to name all of the Commonwealth's sixty-seven counties. *See Black Pol. Empowerment Project v. Schmidt*, 2024 WL 4181592, at *1 (Pa. Sept. 13, 2024). As such, the Pennsylvania Supreme Court's order cannot be seen as a decision on the merits of the Commonwealth Court's holding. It simply vacated that decision because the Commonwealth Court lacked the proper jurisdictional foundation. Because the challenge before this Court is one brought exclusively under the federal constitution, these decisions by the state courts have little relevance here. And as the RNC acknowledges, this Court would not be bound by those decisions in any event. *See* ECF No. 411, p. 2 ("The Commonwealth Court's (now-appealed) ruling, of course, does not bind this Court. This Court remains bound by the rulings of the U.S. Supreme Court and Third Circuit …"). Accordingly, the Court sees no reason to stay this matter or delay a decision on the pending motions.

of a state election law depends upon the extent to which a challenged regulation burdens [constitutional] rights."). Where the law or regulation imposes a "severe" burden, the Court will employ "[s]trict scrutiny" in reviewing the regulation. *See Crawford*, 553 U.S. at 205 (Scalia, J., concurring) *quoting Clingman v. Beaver*, 544 U.S. 581, 592 (2005). But if a burden is not severe and "imposes only 'reasonable, nondiscriminatory restrictions' " on constitutional rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434, *quoting Anderson*, 460 U.S. at 788. *See also Mazo*, 54 F.4th at 145–46.

<ol start="1">
<li>The burden on First Amendment rights</li>
</ol>

Having already recognized that the date requirement burdens the First Amendment right to vote, the Court now must determine to what extent. Although there is no "litmus test" for doing so, this Court concludes that the burden imposes only a minimal burden on Plaintiffs' rights. *Mazo*, 54 F.4th at 146, *quoting Crawford*, 553 U.S. at 191. First, the date requirement is non-discriminatory. Election laws discriminate by "limit[ing] political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Id.* Such laws impose severe burdens and will be "especially difficult for the State to justify." *Id. quoting Anderson*, 460 U.S. at 793. As concerns discrimination against voters, such cases "focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process." *Id. citing Clements v. Fashing*, 457 U.S. 957, 964 (1982). Put another way, the relevant inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity. *Id.* (citation and internal quotation marks omitted). Burdens that apply to all voters, on the other hand, are less likely to be severe. *Mazo*, 54 F.4th at 147. Pennsylvania's

requirement that voters who wish to submit a ballot by mail date the outer envelope applies to <u>all</u> vote-by-mail voters. The requirement draws no distinctions. Thus, it is nondiscriminatory.

        2.      As identified, Pennsylvania's interests are insufficient to justify the requirements of this minimal burden.

Where a state election law imposes only minimal burdens, the State's " 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358, *quoting Burdick*, 504 U.S. at 434. But here, the Commonwealth has not identified what specific regulatory interest is furthered. Indeed, despite formal notification, the Commonwealth has not defended the constitutionality of the dating requirement.[7] In other words, the Commonwealth has not identified any interests that are served by imposing even this minimal burden on the right to vote. Nor, for that matter, have most of the Defendant county boards of elections identified an interest in requiring a voter to date the outer envelope of their ballot.

Only two Defendants have identified state interests which they assert are furthered by the envelope date requirement: the RNC and Berks County. First, they argue that the dating requirement furthers the Commonwealth's interest in detecting voter fraud. ECF No. 378, p. 25 (RNC); ECF No. 379, p. 10 (Berks County). Absent from the record, however, is any evidence demonstrating how this requirement furthers that purported interest. Instead, the RNC points to a <u>single</u> criminal case where the daughter of a deceased voter was charged with fraud after she

---

[7] Pursuant to Federal Rule of Civil Procedure 5.1, the Court notified the Commonwealth of Plaintiffs' challenge to the constitutionality of 25 P.S. § 3146.6(a) and 25 P.S. § 3150.16(a) and instructed the state that it could intervene for the presentation of evidence and argument on the question of the date requirements' constitutionality. *See* ECF No. 383 (Certification dated June 18, 2024). To date, the Commonwealth has not intervened to defend the enforcement of the ballot dating requirement. So then, this Court must proceed without benefit of the Commonwealth's participation here.

allegedly completed, backdated, and returned her deceased mother's mail ballot. ECF No. 378, p. 24-25, *citing Commonwealth v. Mihaliak*, CR126-22 (June 3, 2022). But in *Mihaliak*, the fraudulent ballot was first detected through use of the Commonwealth's SURE system, which was cross-referenced with Pennsylvania Department of Health records, not by any error in dating on the outer envelope.[8] The evidentiary record reflects that the County Board (here, Lancaster) admitted that it removed the deceased woman from the voter rolls before the mail ballot was received. *See* ECF No. 290, p. 156 (deposition of Christa Miller). Record evidence from the Board's own Rule 30(b)(6) designee indicates that the fraudulent ballot was first detected by way of the SURE system and Department of Health records, not by review of the date on the return envelope. *Id*. The County Board acknowledges that it recognized that the ballot was invalid as soon as it was scanned into the SURE system because the voter had been removed from the rolls due to her death. *Id*. at 157. Importantly, the Lancaster County Board admits that an outer envelope that is missing a hand-written date is no reason to suspect voter fraud. *Id*. at 175.

The RNC and the Berks County Board of Elections point to other interests of the Commonwealth which they claim are advanced by the date requirement, but these are not supported by any evidence of record. For example, these Defendants suggest that the Commonwealth has an interest in promoting or preserving "solemnity" in the act of voting,

---

[8] The SURE system is the Commonwealth's Statewide Uniform Registry of Electors, a uniform integrated computer system that, inter alia, tracks mail ballots from application through final tabulation. ECF No. 290 (deposition of Jonathan Marks), pages 23-65. The outer return envelope of a mail ballot is printed with a unique barcode associated with the individual voter. That unique barcode is used to track the ballot through the SURE system. *Id*. at page 33. Upon the county board's receipt of the ballot envelope, the board stamps or otherwise marks it with the date of receipt to confirm its timeliness and log its receipt into the SURE system. *Id*. at pages 29, 32-33. The Election Code requires that county boards of elections track the date that every mail ballot was received and make that information available for public inspection. 25 P.S. § § 3146.9(b)(5), 3150.17(b)(5).

which they define as "ensuring that voters contemplate their choices and reach considered decisions about their government and laws." ECF No. 378, p. 23 (RNC); ECF No. 379, p. 11 (Berks County). They argue that requiring voters to sign and date the outer envelope of a mail ballot is a formality which fosters thoughtful deliberation. This argument is based solely on supposition. And even if Defendants could articulate examples of how dating the outer envelope makes the act of voting more solemn, they have not pointed to any evidence in this record to support their position. They are left only with their nebulous contention that requiring a voter to date their ballot somehow makes it a solemn occasion, which of course is not evidence which could support summary judgment.

Additionally, the RNC contends that the state has an interest in the "orderly administration of elections." ECF No. 378, p. 22. This, of course, is a valid state interest. Nevertheless, the RNC admits that Pennsylvania election officials are required to time stamp a ballot upon receiving it and the officials rely on that date when entering the information into the SURE system. The RNC supposes that while "there is every reason to think this ordinarily happens," "the handwritten date serves as a useful backstop, and it would become quite important if a county failed to timestamp a ballot upon receiving it or if Pennsylvania's SURE system malfunctioned." *Id*. That requiring a voter to handwrite a date serves as a safeguard is a speculative assertion because, again, the RNC has failed to point this Court to any evidence regarding potential failures in the timestamp process or in the SURE system.

Similarly, the Berks County Board claims that enforcing the dating provisions enhances voter "confidence," yet this assertion is also based on conjecture. *See* ECF No. 379, p. 14. The Berks County Board provides no evidence which connects the date requirement to an increase in voter confidence in the electoral process.

None of the potential state interests suggested by the RNC or the Berks County Board are supported by any evidence. Suggestions and legal arguments are not a sufficient ground upon which to base summary judgment, which is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this case, it is up to Defendants, who are asking for summary judgment, to point to evidence that a governmental interest is furthered by the burden the date requirement imposes on the right to vote. Since Defendants have not met this requirement, their motions for summary judgment will be denied.

### D.    Application of the *Anderson-Burdick* Test: Plaintiffs' motion for summary judgment

When a court is faced with cross-motions for summary judgment, the standard of review remains the same. *Jacobs v. City of Philadelphia*, 2023 WL 11904070, at *1 (E.D. Pa. May 8, 2023) *citing Allah v. Ricci*, 2013 WL 3816043 (3d Cir. July 24, 2013). The fact that one party fails to satisfy the burden on its own Rule 56 motion does not automatically mean that the opposing party has satisfied its burden and should be granted summary judgment on the cross motion. *See* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2720 (4th ed. 2020). Instead, "[w]hen confronted with cross-motions for summary judgment, […] the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F.Supp.2d 425, 430 (M.D. Pa. 2006) (cleaned up). In other words, the fact that Defendants have failed to meet their burden does not mean that Plaintiffs have necessarily met theirs.

As explained above, the *Anderson-Burdick* balancing test is the appropriate framework for determining whether Pennsylvania's outer envelope date requirement violates the Plaintiffs'

right to vote under the First Amendment. *See discussion*, *supra*. For the Court to find the date requirement unconstitutional, Plaintiffs must point to evidence that even the limited burden imposed by the date requirement outweighs any valid governmental interest. *See Burdick*, 504 U.S. at 440. Plaintiffs contend that Pennsylvania has no legitimate interest which justifies the outer envelope date requirement. *See* ECF No. 288, p. 24. Instead, they submit that the date requirement is nothing more than a "compliance test" put in place to determine "how well [Pennsylvania voters] can follow written instructions." *Id.*

Plaintiffs discredit the Defendants' suggested state interests of fraud detection, solemnity, and voter confidence. Plaintiffs highlight the lack of evidence in the record to support Defendants' purported state interests, as did the Court above. Ultimately, solemnity and voter confidence are nebulous and are unsupported by evidence, and fraud detection, while less ambiguous of an interest, is similarly unsupported by evidence of record in this case.

Since there is no evidence that the date requirement serves any state interest, even a slight burden on voting rights cannot withstand constitutional scrutiny. Put another way, even the slightest burden that results from the enforcement of the date provision is too much when there is no counterbalance. The evidence of record demonstrates that county boards across the Commonwealth discarded 10,657 otherwise valid ballots in the 2022 general election solely because voters either forgot to date them or used an incorrect date. ECF No. 311, ⁋ 10; ECF No. 313, ⁋ 10; ECF No. 290, p. 246-782. Such disenfranchisement burdens the right to vote and there is no valid state interest to weigh this against. Accordingly, Plaintiffs' motion for summary judgment will be granted in this regard.[9]

---

[9] As discussed *supra*, the evaluation of the constitutionality of the date provisions is complicated by the fact that the state is not present to articulate its own interests. In order to leave no stone

## IV.    Conclusion

Constitutional analysis always requires the balancing of interests – i.e., weighing one thing against another. In the context of the First Amendment right to vote, a court must weigh the individual's right to vote, which includes the right to have their vote counted, against the government interest. In this case, the weight of the burden on the citizens right to vote is not counterbalanced by evidence of any governmental interest. Accordingly, the enforcement of the date provisions does not pass constitutional muster.

---

unturned, this Court looked to the Commonwealth's filings in the companion case of *NAACP v. Schmidt*, in search of an identified governmental interest in the enforcement of the date provisions. The Secretary of the Commonwealth's position there solidifies the result here. In that case, the Secretary notes that he filed his brief in order "to aid the Court's performance of this [*Anderson-Burdick*] balancing by explaining why rejecting timely mail ballots from qualified voters who failed to correctly write a meaningless date does not advance any state election interest and why it, in fact, undermines sound election administration." *See* C.A. No. 1:22-cv-339, ECF No. 440, p. 5-6. Instead of identifying and defending any Commonwealth interest in the enforcement of the dating provisions, the Secretary explains that: 1) the date requirement provisions are a vestige of a different era; 2) the date requirement has no election function; and 3) "requiring officials to review declaration dates impedes effective election administration." *Id.* By way of conclusion, the Secretary succinctly states "**there is no state interest** in rejecting timely mail ballots from eligible voters who merely neglected to correctly date their return-envelope declaration." *Id.* at 20 (emphasis added).